Herman GROSS et al., Plaintiffs,

v.

Roderick WAYWELL et al., Defendants.

No. 08 Civ. 9498.

United States District Court, S.D. New York.

June 16, 2009.

**478**

A. Jared Silverman, Law Offices of A. Jared Silverman, West Orange, NJ, James Bruce Daniels, Budd Larner, P.C., New York, NY, Alfred Michael Covino, Budd Larner Rosenbaum Greenberg & Sade, P.C., Short Hills, NJ, for Plaintiffs.

Gail McLemore Rodgers, Palmina M. Fava–Pastilha, DLA Piper U.S. LLP, Claudia Alejandra Costa, Stryker Tams & Dill, LLP, New York, NY, for Defendants.

### DECISION AND ORDER

VICTOR MARRERO, District Judge.

Plaintiffs Herman Gross ("Gross") and R.A.K. Tennis Corp., ("RAK") (collectively "Plaintiffs") brought this action against defendants Roderick Waywell ("Waywell") and Lisa Waywell (together, the "Waywells"), Hugo Costa ("Costa"), Barbara Errigo[1] ("Errigo"), and Jeffrey Shapiro[2] ("Shapiro") (collectively, "Defendants") alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, as well as various state law causes of action. The unlawful conduct the complaint describes arises from Defendants' operation of Plaintiffs' tennis club and related premises in Long Island City, New York. Arguing that the pleadings fail to state a plausible RICO claim and that no other recognized ground exists to litigate this case in federal court, the Waywells and Costa oppose Plaintiffs' filing of a proposed First Amended Complaint and renew their motions to dismiss it for lack of subject matter jurisdiction. For the reasons stated below, the Plaintiffs' request to file a proposed First Amended Complaint is DENIED and Defendants' renewed motions to dismiss are GRANTED.

### I. BACKGROUND

Samuel Johnson, upon learning that a gentleman who had been very unhappy in marriage had rewed immediately after his wife's death, characterized the husband's new vows as "the triumph of hope over experience."[3] Plaintiffs' pursuit of their RICO claims in this suit, repeating the similarly failed experiences of a large majority of RICO plaintiffs, illustrates the litigants' version of Johnson's insight.

---

**1.** Plaintiffs' proposed First Amended Complaint (the "Amend. Compl.") states that Errigo is now deceased. (*See* Amend. Compl. ¶ 6.) An action against a deceased defendant abates unless the Court authorizes the substitution of another proper party. *See* Fed. R.Civ.P. 25(a). Plaintiffs never sought leave to amend the complaint to substitute Errigo's estate but in the amended complaint continued to name Errigo as a defendant. On this ground alone the complaint must be dismissed as to Errigo. Because the federal claims Plaintiffs assert against Errigo are dismissed on other substantive and jurisdictional grounds discussed below, no further leave to amend the complaint is warranted.

**2.** Shapiro has not answered the complaint or otherwise appeared in this action. Because all of the claims Plaintiffs assert against Shapiro are grounded on state law, and the dismissal of Plaintiffs' federal claims leaves no other basis for the Court's exercise of jurisdiction as regards Plaintiffs' remaining causes of action, the complaint must be dismissed as to Shapiro as well.

**3.** James Boswell, *The Life of Samuel Johnson*, (David Wormersley, ed. 2008), at 327.

These introductory notes provide the historical backdrop that served as context for the Court's assessment of the underlying dispute.

At the initial conference with the parties, following Defendants' filing of a motion to dismiss the original complaint and before considering any further briefing, the Court expressed concurrence with Defendants' objections challenging the sufficiency of Plaintiffs' pleadings of their RICO counts. Based on its review of the controversy as portrayed in the complaint and elaborated at the conference, the Court also voiced substantial doubt about the likelihood that—other than through lawyerly sleight of hand, shoehorned pleadings or Procrustean means—Plaintiffs would be able to reshape their factual allegations enough to cure the fundamental deficiencies that flawed their original complaint, and thus to satisfy the standards that govern the statement of plausible RICO claims. Since RICO comprises the only ground for federal jurisdiction that Plaintiffs invoked, the Court warned that if the litigation were to advance on the basis of the RICO counts as pled, a dismissal of the complaint at a later stage of the proceedings would be wasteful of the parties' and the Court's time, energies and resources, and in addition potentially could place at risk Plaintiffs' ability to further prosecute their arguably viable state law claims.

As regards those other causes of action, the Court notes that even if only a portion of the egregious wrongs Plaintiffs complain about were borne out by a trial on the merits, the adjudication conceivably could yield recovery, counting possible punitive damages, approaching any award Plaintiffs might obtain if their RICO claims were sufficient and ultimately prevailed in this Court. With these observations and admonitions, the Court granted Plaintiffs time to ponder whether to seek to amend their complaint, or withdraw it in favor of proceeding with the litigation of their common law claims in state court. Plaintiffs, as do so many other claimants enticed by the charm of a RICO verdict, chose to try again to fit insufficient factual allegations into RICO's complex pleading standards. They submitted the proposed Amended Complaint, prompting Defendants' opposition to the filing of the amended pleadings and a renewal of their motions to dismiss. Here, the Court denies Plaintiffs request to file the Amended Complaint and grants Defendants' motions.

Not surprisingly, RICO's enchantment, like the siren's song, has again drawn another crew of spellbound plaintiffs foundering against the rocks. This outcome should come as no surprise to any counsel versed in the formidable intricacies and pitfalls inherent in RICO litigation. These challenges bear out in the minimal rate of success plaintiffs have achieved in prosecuting RICO actions. A survey of 145 appellate decisions nationwide rendered from 1999 to 2001 in connection with RICO civil actions provides hard evidence of those failed expectations. It revealed that about 70 percent of the cases were finally disposed of on defendants' motions to dismiss or for summary judgment, and that in about 80 percent of those in which the appellate Court resolved a RICO issue the ruling was favorable to defendants. *See* Pamela H. Bucy, *Private Justice,* 76 S. Cal. L.Rev. 1, 22 (2002). Of the 9.6 percent of the suits in which plaintiffs obtained a favorable verdict after a jury trial, only 25 percent of the judgments were affirmed on appeal. *See id.* In consequence, plaintiffs achieved a final victory in only three of 145 cases—a or final success rate of a mere two percent.

Framed another way, the statistical record indicates that in 98 percent of the RICO appellate cases surveyed, which do not include RICO actions dismissed by the district courts but not appealed, plaintiffs and counsel invested extensive time and energies in litigation only to come away with a total loss. Arguably, in some of these actions the resources plaintiffs expended were probably far greater, and yielded poorer outcomes, than the potential corresponding outlays and results had they litigated any related common law claims in state courts.

To further examine this statistical record with more recent data, and also contrast it with a sample of RICO results at the district court level, this Court conducted a rough survey of the 145 cases filed in the Southern District of New York from 2004 through 2007 in which the complaints asserted civil RICO claims. The study revealed that of the 36 cases that to date have been resolved on the merits, all resulted in judgments against the plaintiffs. Thirty were dismissed on defendants' motions pursuant to Fed.R.Civ.P. 12(b)(6), three dismissed by the district court *sua sponte* for lack of merit, and three dismissed on summary judgment for the defendants. Only four of the 30 Rule 12(b)(6) dismissals were appealed and each was affirmed by Second Circuit. Two of the three dismissals on summary judgment were appealed and both were affirmed.[4] Hence, experience bears out that overwhelmingly the RICO plaintiffs' gilded vision of threefold damages and attorney's fees dispels into a mirage.

Of course, Plaintiffs' perseverance against such heavy odds derives predominantly from RICO's prospect of treble damages and attorneys fees for the successful claimant. Litigants' general preference for proceeding in federal courts adds another consideration. Tactical and economic reasons also play a role. The terrorizing aspect of a RICO charge conjures dreadful images of the defendant's involvement in the racketeering schemes of the prototypical colorful mobsters and violent thugs who ordinarily fill the plots of organized crime. For plaintiffs seeking to score a tactical edge or to deal the heaviest possible vengeful blow to the defendant's personal reputation, shocking RICO accusations may serve to strengthen their hand or induce sooner capitulation in any settlement discussions. The extraordinary costs associated with defending complex charges may also inflict added pain and provide defendants greater incentive to curtail RICO litigation.

Ironically, the attractions that explain the magnetlike pull which induces plaintiffs into filing RICO charges also generate counter-forces that repel them. In the final analysis, these pluses and minuses point to some reasons why the incidence of favorable judgments for RICO plaintiffs is so "stunningly awful." *Id.* Fundamentally, as many courts and commentators have noted, RICO plaintiffs have overreached well beyond the bounds of the law's reasonable construction and fair-game litigation. RICO simply was not designed by

---

4. Forty-eight of the remaining 109 actions were voluntarily dismissed, 22 were transferred to another district or dismissed on procedural grounds, and 31 are still pending. Of the 48 voluntary dismissals, 11 occurred following a motion to dismiss. Oddly, the only cases in which plaintiffs achieved some measure of success are eight in which no defendant appeared and default judgments were entered. In four of these the plaintiffs obtained an award of damages that specifically referred to the RICO claims. For defendants, a lesson that may be drawn from the overall RICO litigation experience supports Woody Allen's theory that a major part of success in life is just showing up. The details of this Court's survey are contained in the Chambers file for this case.

Congress to encompass many of the creative, and even "extraordinary, if not outrageous uses" for which plaintiffs have labored the statute. *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 741 F.2d 482, 487 (2d Cir.1984), *rev'd on other grounds,* 473 U.S. 479, 500, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *see also* William H. Rehnquist, *Diversity Jurisdiction and Civil RICO,* 21 St. Mary's L.J. 5, 11 (1989) (noting that "civil RICO claims have been raised in actions relating to divorce, trespass, legal and accounting malpractice, inheritance among family members, employment benefits, and sexual harassment by a union."); *see also id.* at 9 ("Virtually everyone who has addressed the question agrees that civil RICO is now being used in ways that Congress never intended when it enacted the statute in 1970."); *Sedima,* 473 U.S. at 500, 105 S.Ct. 3275 (recognizing that "in its private civil version, RICO is evolving into something quite different from the original conception of its enactors.").

■ Rather, as manifested by the references to "racketeer" and "racketeering" in the legislation act as well as by its exceptional treble damages remedy, Congress signaled that the legislation was meant as both "preventive and remedial." *United States v. Turkette,* 452 U.S. 576, 593, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). This dual purpose demonstrates a design not only to compensate victims, but also to punish and deter criminal offenses. For these purposes, RICO serves as a law enforcement tool supplementing the government's efforts to protect the general public and the common good from felonious conduct by encouraging and enlisting the civil litigation services of "private attorneys general." *Agency Holdg. Corp. v. Malley–Duff & Assocs.,* 483 U.S. 143, 151, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). Instead, experience reveals that many plaintiffs, rather than fostering RICO's mission as "private attorneys general" aiding public law enforcement, actually appear as private prospectors digging for RICO's elusive gold, and more often than not generating substantial costs rather than net gains to the public. Among other ways, the negative yield from this reality stems inherently from the gravity of RICO accusations. The more defendants in civil suits are tarnished with serious charges as racketeering criminals the more it stiffens their indignant resistance, extending the duration and thus the private and public costs of litigation, and contributing to plaintiffs' counterproductive outcomes. In significant part, the public outlays incurred accrue in the form of time and other resources courts devote to adjudicating significant numbers of meritless RICO claims that, as the numbers bear out, should never have been seriously litigated in the first place.

As this Court reads RICO's text and legislative history, as elaborated below, the act sought to strike at criminal conduct characterized by at least two consequential dimensions. The offenses must be of a degree sufficiently serious not only to inflict injury upon its immediate private victims, but also to cause harm to significant public processes or institutions, or otherwise pose threats to larger societal interests worthy of the severe punitive and deterrent purposes embodied in the statute. These aims and structure are somewhat akin to those reflected in the Clayton Act, 15 U.S.C. § 15, after which RICO civil remedies were patterned. *See Agency Holding,* 483 U.S. at 151, 107 S.Ct. 2759 (describing the similarity of RICO and the Clayton Act, the Supreme Court noted that both "are designed to remedy economic injury by providing for the recovery of treble damages, costs, and attorney's fees. Both statutes bring to bear the pressure of 'private attorneys general' on a serious national problem for which public

prosecutorial resources are deemed inadequate"); *see also Sedima*, 473 U.S. at 489, 105 S.Ct. 3275; *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 912 (3d Cir.1991) ("Congress obviously had much more in mind than merely providing compensation for individual RICO victims when it authorized RICO civil actions. Indeed, the harm of racketeering is dispersed among the public at large, including draining resources from the economy, subverting the democratic process and undermining the general welfare.")

This construction accords with the legislative intent of RICO. As explained by the Supreme Court, the purpose of the Act was to address a problem which Congress perceived "was of national dimensions." *Turkette*, 452 U.S. at 586, 101 S.Ct. 2524. Specifically, in the Statement of Findings and Purpose of the Organized Crime Control Act of 1970, Title IX of which encompassed RICO, Congress declared that the activities of organized crime that prompted the legislation "weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commence, threaten the domestic security, and undermine the general welfare of the Nation and its citizens." Statement of Findings and Purpose, Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 922, 923 (1970).

Branding defendants in civil actions with searing accusations of racketeering activities and thus prolonging ill-considered litigation to promote the private interests of only one or a few victims, and in lawsuits arising from alleged fraudulent schemes limited to localized impacts and wrongful conduct far afield from the dimensions and degree of serious criminal offenses Congress had in mind as RICO violations, is bound to engender disfavor from courts and juries alike. In such circumstances, the courts' responses to litigants' efforts to stretch the contours of the law beyond reasonable bounds "emerges from a desire to make the statute make sense and have some limits." *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 226 (7th Cir.1997).

Moreover, in some cases involving related state law causes of action, improper invocation of RICO implicates a question of federalism. By filing actions in federal courts that fall short of RICO's substantive threshold, plaintiffs often seek the courts' exercise of federal jurisdiction over litigation that more properly falls within the province of state law remedies. Exercise of federal court jurisdiction in such cases, especially those that rely on nothing more than incidental use of the mails or wires in furtherance of a simple fraudulent scheme with few victims and narrow impacts, would threaten to federalize garden-variety state common law claims, and offer a remedy grossly out of proportion to any public harm or larger societal interests associated with localized wrongful conduct ordinarily involved in such actions. Moreover, insofar as RICO plaintiffs consistently lose in federal court and may later be foreclosed by statutes of limitations or preclusion rules from pursuing common law causes of action, they diminish the ability of state courts to redress what might otherwise represent viable state law claims. With regard to these considerations, as the Seventh Circuit has noted, "When a statute is broadly worded in order to prevent loopholes from being drilled in it by ingenious lawyers, there is a danger of its being applied to situations absurdly remote from the concerns of the statute's framers." *Id.*

In sum, the combination of these circumstances translates into the RICO plaintiffs' woeful failure rate. The boundaries of RICO simply do not encompass the over-

size capacity or elasticity to accommodate the many ill-fitting suits with which plaintiffs seek to outfit the statute. As a consequence, in the inordinate lawyerly tailoring that has ensued, even if artful, it is the plaintiffs who end up bare.

The case at hand prompted these observations because it again brought to light the extent to which plaintiffs' visions of RICO awards are out of touch with the dismal empirical reality borne out by RICO litigation. The bewildering disconnect, illustrated by the statistical surveys described above, suggested to this Court yet another explanation that might account in part for plaintiffs' tenacity in pursuing RICO claims in the face of the highly improbable odds of prevailing on the merits, or indeed of achieving any other meaningful favorable result: lack of sufficient awareness. Perhaps the grim statistical record documenting plaintiffs' limited success rate in RICO litigation has not adequately penetrated the plaintiffs' bar. Perhaps the elements of a RICO action, the applicable pleading standards, and the rigorous evidentiary requirements that must be met to ultimately prevail in establishing a RICO claim are inadequately known or not properly understood. Perhaps, too, greater judicial clarity in articulating the governing rules and highlighting the types of pleading and evidentiary deficiencies that produce widespread failure to satisfy the elements of RICO—potentially depriving plaintiffs of valid state law claims that might stand a greater likelihood of favorable results if litigated in state court—might better inform Plaintiffs in this action as well as other prospective litigants about the pitfalls, risks and slim chances of prevailing in all stages of RICO litigation.

Judicial decisions generally serve several informative ends. They apprise the parties, counsel, appellate courts and the interested public about the law as interpreted and applied by the trial judge. They open a window into the court's method, bringing to view the judicial considerations that map out and illuminate the judge's reasoned pathway to the law of the case. And they instruct the parties in the immediate action as well as in future litigation about the legal concepts one court applied in adjudicating a given dispute, by means of such precedents providing guidance that could inform the substantive and procedural course of subsequent litigation. In calling attention to the decisive issues and considerations that resulted in the dismissal of this action, the Court envisions that the lessons drawn from the experience might be instructive at least in these ways, and that this teaching might propagate, by encouraging Plaintiffs here as well as other parties contemplating RICO suits to give more sober assessment to their factual allegations and their prospects, and thus potentially deter wasteful litigation of fundamentally deficient, futile or even frivolous claims. Admittedly, by indulging above in a dark analysis, here laced with this silver lining, the Court recognizes that its aspiration might reflect just self-beguilement, that on this occasion, once again, hope trumps experience.

## II. FACTS

Gross, now over 90 years old, is a director and 90 percent owner of RAK, a New York corporation that until 2003 owned a parcel of real estate located at 44–02 Vernon Boulevard, Long Island City, New York (the "Premises"). RAK operated the Premises as a tennis club until about September of 2004. Waywell was the president, treasurer and a director of RAK. Costa, reporting to Waywell, acted as the controller and, at times, as secretary of RAK. Errigo, now deceased, was RAK's bookkeeper and accounts payable clerk and reported to Costa and Waywell.

Shapiro was the membership director and also reported to Waywell.

Plaintiffs seek to recover funds they allege Defendants looted from RAK over a period of about five years from 2000 to 2004. According to Plaintiffs, the monies wrongfully taken from RAK were used by the Waywells to pay for various personal expenses, including costs associated with the renovation and maintenance of their homes in Manhattan and Southampton, New York, as well as their automobiles, private club memberships and children's transportation. Plaintiffs claim that these payments were concealed by Costa and Errigo on RAK's books as legitimate RAK business expenses. To this end, Waywell, Costa and Errigo (collectively the "Management Defendants") collaborated from 2000 to 2004 for the purpose of looting the assets of RAK for their personal gains.

Specifically, Errigo prepared checks which Waywell signed that were made out to Errigo, or to cash or unknown vendors, and that Errigo endorsed, cashed and retained the proceeds. For his part, Costa allegedly decided how the unlawful payments to Waywell and Errigo would be posted in RAK's books so as to disguise the transactions as legitimate RAK business expenses. Costa also allegedly benefitted from the scheme by directing payments of RAK funds to a computer company he owned and to pay for a personal automobile, none of which expenses related to services provided to or for RAK. Plaintiffs claim that in connection with the winding down of RAK's operations in September 2004, Waywell, Costa and Errigo caused unlawful payments to be made for membership refunds that were so recorded in RAK's books although the monies were not intended for such purposes, but for the benefit of Defendants or other entities designated by them. According to Plain-

tiffs, to engage in these activities the Management Defendants formed an association-in-fact enterprise controlled by Waywell for the purpose of stealing RAK funds for their personal use, and their unlawful conduct constituted a pattern of racketeering through predicate acts of wire and mail fraud in violation of RICO.

As to Shapiro, Plaintiffs allege that as RAK's tennis club membership director, he conducted an unlawful membership drive, offering memberships at a discount to cash-paying customers that would extend even after the Premises had been sold and the club would have ceased operations. Because of customers' complaints, RAK had to make refunds to members. Plaintiffs claim the Management Defendants knew or should have known of Shapiro's activities.

The Waywells and Costa filed separate opposition to Plaintiffs' proposed Amended Complaint and renewed their motions to dismiss. Because the Court granted Plaintiffs leave to submit a proposed Amended Complaint and finds that the revised pleadings remain fundamentally deficient for the reasons described below, and that further briefing or repleading would be futile, the Court denies Plaintiffs' request to file the Amended Complaint and grants Defendants' renewed motions to dismiss the Amended Complaint.

## III. DISCUSSION

### A. STANDARD OF REVIEW

In assessing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) and (6), dismissal of the complaint is appropriate if the plaintiff has failed to offer sufficient factual allegations making any asserted claim "plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A court should not dismiss a complaint for

failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Id.* at 555, 127 S.Ct. 1955. The task of the court in ruling on a motion to dismiss is to "assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *In re Initial Publ. Offer. Secs. Litig.*, 383 F.Supp.2d 566, 574 (S.D.N.Y.2005) (internal quotation marks and citation omitted). The court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

## B. *RICO SUBSTANTIVE CLAIM*

### 1. *Pattern of Racketeering*

Plaintiffs allege that the Management Defendants scheme to defraud RAK and Gross constituted a substantive violation of RICO under 18 U.S.C. § 1962(c) ("§ 1962(c)"). To state a plausible civil claim for violation of RICO § 1962(c), Plaintiffs' pleadings must demonstrate, as to each defendant, that while employed by or associated with an enterprise engaged in interstate or foreign commerce, and through the commission of at least two predicate acts constituting a "pattern of racketeering," the defendant directly or indirectly conducted or participated in the conduct of the affairs of such enterprise. 18 U.S.C. § 1962(c); *see Spool v. World Child Int'l Adoption Ag.*, 520 F.3d 178, 183 (2d Cir.2008) (*citing Cofacrèdit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir.1999)); *see generally* Gregory P. Joseph, *Civil RICO: A Definitive Guide*, (2d ed.2000). The specific predicate acts that constitute racketeering activity are defined as the criminal offenses enumerated in the statute, which include mail and wire fraud. *See* 18 U.S.C. § 1961(1).

Plaintiffs must also show that they were injured in their business or property by reason of the alleged RICO violation. *See* 18 U.S.C. § 1964(c); *Moss v. Morgan Stanley*, 719 F.2d 5, 17 (2d Cir.1983). To satisfy the "pattern" requirement, the factual allegations must meet two standards: relatedness and continuity. The pleadings must show that the predicate acts asserted are related and amount to or pose a threat of continuing criminal activity. *See Cofacrèdit*, 187 F.3d at 242 (*citing H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)); *GICC Capital Corp. v. Technology Fin. Group, Inc.*, 67 F.3d 463, 465 (2d Cir.1995). The relatedness test requires that the predicate acts relied upon "share the same or similar purposes, results, participants, victims or methods, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240, 109 S.Ct. 2893. The continuity element may take either of two forms: "closed-ended" or "open-ended." These concepts refer "either to a closed period of repeated conduct, or to post-conduct that by its nature projects into the future with a threat repetition." *Id.* at 241, 109 S.Ct. 2893. Closed-ended continuity may be demonstrated by a series of related predicate acts which occurred over a substantial period of time. *See id.* Open-ended continuity requires a showing of the existence of a threat of containing criminal activity beyond the period during which the predicate acts were performed. *See Cofacrèdit*, 187 F.3d at 243.

#### a. *Multifactor Test*

Here, Plaintiffs contend that the Management Defendants' unlawful conduct satisfied the closed-ended continuity con-

cept because it consisted of many predicate acts of wire and mail fraud occurring over a period of more than four years. However, neither the number nor duration of the alleged unlawful conduct, without more, is necessarily determinative of continuity. *See H.J. Inc.,* 492 U.S. at 238, 109 S.Ct. 2893 (declaring that "[i]t is not the number of predicates, but the relationship that they bear to each other or to some external organizing principle that renders them 'ordered' or 'arranged' " so as to constitute a pattern). On this point, the Second Circuit, while stating that closed-ended continuity is primarily a temporal concept, has recognized that other considerations, such as the number and variety of predicate acts, the number of participants and victims and the presence of separate schemes, may also be germane to this inquiry. *See Spool,* 520 F.3d at 184; *Cofacrèdit,* 187 F.3d at 242 (noting that "other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists" (*citing GICC,* 67 F.3d at 468)); *see also GICC,* 67 F.3d at 468–69 (noting that the plaintiff's allegations "do not present a 'complex, multi-faceted conspiracy to defraud executed by numerous officers and stockholders' " (citation omitted)).

Other Circuit Courts look to similar or even more expansive multiple factors in assessing whether the closed-ended concept of continuity has been satisfied. *See, e.g., Tabas v. Tabas,* 47 F.3d 1280, 1292, 1296 n. 21 (3d Cir.1995) (determining continuity by the number of unlawful acts, the length of time over which the predicates were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity (*citing Barticheck v. Fidelity Union Bank/First Nat'l State,* 832 F.2d 36 (3d Cir.1987))); *Columbia Natural Res., Inc. v. Tatum,* 58 F.3d 1101, 1110 (6th Cir.1995) (duration of the racketeering activity, the number of different schemes, the number of predicates, the types of injury, and the number of victims and perpetrators); *Edmondson & Gallagher v. Alban Towers Tenants Ass'n,* 48 F.3d 1260, 1265 (D.C.Cir.1995) (same as *Barticheck*); *Vicom, Inc. v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771, 780 (7th Cir.1994) (the number and variety of predicate acts and their duration, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries (*citing Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir.1986))); *HMK Corp. v. Walsey,* 828 F.2d 1071, 1073–74 (4th Cir.1987) (in addition to the number of predicate acts and their duration, the existence of a pattern "depends on context, particularly on the nature of the underlying offenses"); *Resolution Trust Corp. v. Stone,* 998 F.2d 1534, 1543–44 (10th Cir.1993) (duration of the predicate acts and extensiveness of the scheme, including the number of victims, the number and variety of the predicates, the complexity and size of the scheme, and the nature or character of the enterprise or unlawful activity); *cf. Fleet Credit Corp. v. Sion,* 893 F.2d 441, 446 (1st Cir.1990) (evaluating continuity solely by the number of predicate acts and their duration).

The courts' consideration of multiple factors beyond mere arithmetic number of predicate acts or their temporal duration as a test of continuity finds some grounding in *H.J. Inc.* There, the Supreme Court recognized that the precise methods by which continuity may be proved "cannot be fixed in advance with such clarity that it will always be apparent whether in a particular case a 'pattern of racketeering activity' exists," and that further development of the concept would await future

cases. 492 U.S. at 243, 109 S.Ct. 2893; *see also id.* at 241, 109 S.Ct. 2893 (noting that proving continuity "may be done in a variety of ways, thus making it difficult to formulate in the abstract any general test for continuity"); *United States Textiles, Inc. v. Anheuser–Busch Cos., Inc.,* 911 F.2d 1261, 1266 (7th Cir.1990) ("[A] concrete definition for precisely what activity will constitute a 'pattern' for purposes of the RICO statute has eluded the federal courts.") However, other than listing the relevant considerations weighed, and the vague comfort that the determination depends on the "context" and circumstances of the particular case, the courts' multifactor test analysis offers little guidance as to what fundamentally makes a pattern a RICO pattern.

The Supreme Court has instructed that in discerning congressional intent courts may look to legislative history and other considerations, such as "the identity of the class for whose benefit the statute was enacted, the *overall legislative scheme,* and the traditional role of the states in providing relief." *Texas Indus., Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 639, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981) (emphasis added) (*citing California v. Sierra Club,* 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981); *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)). RICO's overall scheme suggests another consideration implicit in a finding of closed-ended continuity by reference to a contextual assessment of various factors: the relationship that the alleged predicate acts bear in particular circumstances to an "external organizing principle" common to all RICO cases, specifically the congressional intent embodied in the definition of "pattern of racketeering activity." *H.J. Inc.,* 492 U.S. at 238–39, 109 S.Ct. 2893. The imposition of a standard requiring both a "pattern" and "racketeering activities" defined by specific crimes yields a

predictable effect; it narrows the application of the statute. Congress thus evinced a view that meritorious RICO actions ordinarily would encompass claims involving criminal conduct of sufficient gravity not only to injure the plaintiff's business or property, but to cause some public harm or pose a threat of injury to larger societal interests reflecting the magnitude of those articulated in the statute's Statement of Findings and Purpose. *See* Statement of Findings and Purpose, Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 922, 922–923 (1970).

By the same token, in part reflecting concerns over federalism, the legislation sought to exclude actions not serious enough to warrant providing remedies at the level of federal law, to the extent the alleged offenses implicate narrow substantive scope and limited local effects that bring into play "the traditional role of the states in providing relief." *Texas Indus.,* 451 U.S. at 639, 101 S.Ct. 2061; *see also Cofacrèdit,* 187 F.3d at 242 (noting that "[m]ere common-law fraud does not constitute racketeering activity for RICO purposes"); *HMK Corp.,* 828 F.2d at 1076 ("Congress chose the 'pattern requirement' . . . as the mechanism by which 'ordinary claims of fraud best left to "the state common law of fraud'" are distinguished from those activities of such a 'criminal dimension and degree' as to warrant the extraordinary remedies of RICO." (citation omitted)); *see also Menasco, Inc. v. Wasserman,* 886 F.2d 681, 683 (4th Cir. 1989) (noting that the pattern requirement acts to ensure that "RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the multiple state and federal laws bearing on transactions . . . are not eclipsed or preempted").

This statutory design manifests in several provisions of the legislation that reflect both qualitative and quantitative measures, elements of dimensions and degrees that, working as a whole, operate to confine the range of RICO's remedies. The activities about which Congress was concerned must be long-term. *See H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. 2893. Such conduct must entail at least two predicate acts. The illegal activities must fall within the list of crimes specified in the statute. The racketeering offenses must be related and continuous. The criminal pattern must extend over a substantial period of time; sporadic or isolated wrongdoing does not suffice. *See id.; Sedima*, 473 U.S. at 497 n. 14, 105 S.Ct. 3275; *GICC*, 67 F.3d at 467. The RICO violations must cause injury to "business or property," 18 U.S.C. § 1964(c), thus personal or emotional damages do not qualify. *See Genty*, 937 F.2d at 918–19.

The constraints thus incorporated into RICO's pattern requirement serve several filtering and preventive ends: that wrongdoers committing only widespread frauds or other major criminal offenses are subject to the statute's severe penalties; that RICO's extreme remedies are not disproportionate to the gravity of the misconduct; and that RICO does not work to preempt other state or federal laws, or to federalize garden-variety state common-law causes of action. *See Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir.1992) ("[I]t is ... evident that RICO has not federalized every state common-law cause of action available to remedy business deals gone sour."); *U.S. Textiles*, 911 F.2d at 1268 ("[W]e ... think it unlikely that Congress intended the draconian measures of RICO to apply to this allegation of 'garden-variety' fraud."); *Menasco, Inc.*, 886 F.2d at 683 (noting that by means of the pattern requirement and treble damages remedy "Congress contem-plated that only a party engaging in widespread fraud would be subject to such serious consequence").

In construing the reach of RICO's application, the Supreme Court has counseled that Congress had in mind a "natural and commonsense approach to RICO's pattern element." *H.J. Inc.*, 492 U.S. at 237, 238, 109 S.Ct. 2893 (rejecting the view that a pattern may be established merely by proving two predicate acts, and explaining that it is not the number of predicate acts but the relationship they bear to each other and to other relevant external principles that properly determine the existence of a RICO pattern of racketeering.) To comport with this practical guidance, the statute's various prerequisites must of course be read together as interrelated. Accordingly, the multifactor tests various Circuit Courts apply in assessing the existence of continuity suggest several strands that perhaps reflect a unifying thread.

■ First, continuity does not constitute solely a temporal concept based only on a numerical sum of predicate acts occurring over a given period of time. Rather, the element is measured by the interrelationship that exists among the various requirements the statute imposes to narrow its range, or, as the Seventh Circuit characterized it, "to trim off the excesses in civil RICO suits." *United States v. O'Connor*, 910 F.2d 1466, 1468 (7th Cir.1990). Second, the variables considered do not all carry the same weight. *See, e.g., Edmondson*, 48 F.3d at 1265 (noting that in some cases "some factors will weigh so strongly in one direction as to be dispositive"). In consequence, not all predicate acts are equal; one incident of mail fraud and one of murder would not count the same on a scale of criminal values. Under some circumstances, therefore, a large number of some predicate acts occurring

over a substantial period of time may not necessarily suffice to constitute a pattern, while a lesser number of another offense committed during a shorter time could satisfy the standard.[5] *See Tabas,* 47 F.3d at 1305 (Greenberg, J., dissenting) (stating that it seems "self-evident that there are three-month long schemes that clearly fall within RICO's purview and three-year schemes that clearly do not").

Third, the concept of continuity cannot be viewed as a disembodied abstraction analyzed in a vacuum, nor as an indefinite tautology, as implied by cases holding that continuity exists simply when a sufficient number of predicate acts has continued long enough. *See, e.g., Fleet Credit,* 893 F.2d at 447. This seemingly circular notion raises conceptual questions because, insofar as grounded on a simple formula of counting months and predicates, it relies on less than the whole of RICO's overall legislative scheme. In doing so, the approach overlooks that in construing the continuity concept as a prong of RICO's pattern requirement, the Supreme Court was not enunciating continuity for the sake of a formulaic fascination with symmetry, but instead reading two essential aspects of congressional concern: the external effects of certain criminal activities, and the internal framework of the statute.

### b. Societal Threat

Under the more comprehensive, commonsense analysis, related racketeering activity comprised of a sufficient number of predicate acts extending over a substantial period of time would form a RICO pattern at some point along a continuum when a particular threshold is crossed or a critical mass of something is reached that causes a sufficient degree of unwanted external effects. That eventuality should be determined in relation to other RICO

---

**5.** A simple hypothetical may further illustrate the point. If in order to defraud a partner and take control of a local real estate business one partner had deposited twelve deceptive documents in the mail on a monthly basis during a period of one year, some courts would find these activities insufficient to establish the existence of a RICO pattern of racketeering in some circumstances. *See, e.g., GICC,* 67 F.3d at 468 (citing cases). But if the offender had instead deposited six bodies in the river, for the same purpose and during the same or even a shorter timeframe, a finding that a pattern existed is more likely. Arguably, by reason of the greater gravity of the crimes and their larger dimensions of public harm and societal threats, the likelihood that the courts would find the existence of a RICO pattern is greater under these circumstances, and explains why, though applying identical statutory language, courts more readily find RICO patterns in criminal prosecutions than in civil cases. *See, e.g., United States v. Aulicino,* 44 F.3d 1102, 1113–14 (2d Cir.1995) (pattern and threat of its continuity found in seven kidnappings committed over a period of three and one-half months); *O'Connor,* 910 F.2d at 1468 (finding a sufficient pattern in a RICO criminal case in which the defendant, a police officer, agreed to take monthly bribes over a two-month period to provide corrupt services); *United States v. Indelicato,* 865 F.2d 1370, 1383 (2d Cir. 1989) (en banc) (holding that three almost simultaneously acts of murder in furtherance of an activity of a criminal enterprise constituted a pattern of racketeering). On the other hand, under some circumstances a complex fraudulent scheme that entails a mailing of deceptive documents to thousands of victims could constitute a pattern. *See, e.g., Beauford v. Helmsley,* 865 F.2d 1386 (2d Cir.) (en banc), *vacated and remanded,* 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584, *original decision adhered to,* 893 F.2d 1433 (2d Cir.), *cert. denied,* 493 U.S. 992, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989); *cf. Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 239, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (noting that " '[T]he makings of a "pattern of racketeering" are not yet clear, but the fact remains that a "pattern" for civil purposes is "a pattern" for criminal purposes' " (*quoting Page v. Moseley, Hallgarten, Estabrook & Weeden, Inc.,* 806 F.2d 291, 299 n. 13 (1st Cir. 1986))).

measures and the statute's overall framework.

Specifically, what the courts' multifactor tests suggest is that alleged RICO criminal acts become properly "arranged" by reference to another "external organizing principle," and thus continuity gives rise to a pattern, when the criminal offenses committed align with other facts to present the elements of a prototypical RICO case, and thereby result in injury of the dimension and degree the statute sought to deter and punish. *H.J. Inc.*, 492 U.S. at 238, 109 S.Ct. 2893; *see also Fitzgerald*, 116 F.3d at 227 (describing the prototypical RICO case as one in which "a person bent on criminal activity seizes control of a previously legitimate firm and uses the firm's resources, contacts, facilities, and appearance of legitimacy to perpetrate more, and less easily discovered, criminal acts than he could do in his own person, that is, without channeling his criminal activities through the enterprise that he has taken over" (*citing Turkette*, 452 U.S. at 591, 101 S.Ct. 2524; *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 457 (7th Cir.1982); *United States v. Carson*, 52 F.3d 1173, 1176–77 (2d Cir.1995))). In identifying and evaluating actual and potential harmful results, this principle necessarily implicates a normative weighing of private and public injuries and interests. At bottom, the test holds that there is a direct correlation, on one side of the equation, between the duration, number and gravity of the criminal acts committed, and, on the other, the dimension and degree of injury caused. At some point along this measure of continuity, a quantum of injury caused by certain crimes rises to a level at which it produces larger societal impacts, and at that point the wrongdoing transforms from a mostly private affair to one that justifies the extraordinary legislative response RICO provides.

To warrant RICO's severe penalties brings into play the legislation's overall internal framework. The racketeering activities alleged should be of sufficiently serious dimensions and degree, both qualitatively and quantitatively, not only to cause the private injury the victim claims, but to produce some public harm or pose a societal threat that extends beyond the narrow interests of a few victims or the limited scope of some RICO predicate acts. Conversely, a simple scheme of restricted scope and effects would fail to satisfy the concept of continuity more comprehensively defined because the underlying conduct would not add up to the sum of its parts. That is, the wrongdoing would not implicate other essentials that serve RICO's larger purpose and justify its extreme remedies. To apply RICO to such a case would bring the statute's heavy remedial arsenal to bear upon what is predominantly a private injury, rather than one which, either because it reflects similar injuries to large numbers of other victims and/or because of the inherent gravity of the underlying crimes, expands the dimensions and degree of wrong committed into a realm implicating greater societal concerns, thereby supporting corrective public intervention in the form provided by the statute. To the extent an application of RICO is sought primarily to vindicate an individual injury devoid of some grounding with a larger public dimension, the role of "private attorney general" in aid of public law enforcement would drop from the equation. In that event RICO's treble damage remedy would not serve its design as an inducement for the victim to undertake a costly role with a broader public purpose in mind, nor would the remedy adequately operate, as do all penalties in criminal conduct, both to punish and deter. An award of threefold damages under these circumstances would be disproportionate

to the offense and amount to a windfall for the victim.

The Second Circuit has not addressed the actual or potential societal harms of the unlawful conduct as distinct aspects of its multifactor test. But, whether the larger societal concern is expressly articulated as a distinct element, as some courts do by weighing the character or seriousness of the charged criminal conduct, or embodied in the courts' decisions as an unstated result of the circumstances taken into account in the particular case, the broader consideration emerges as an aspect of the pattern analysis in numerous cases from other Circuits. *See, e.g., Midwest Grinding Co.,* 976 F.2d at 1025 (noting the Supreme Court's "refocusing the pattern requirement on the sort of long-term criminal activity that carries some quantum of threat to society"); *U.S. Textiles,* 911 F.2d at 1269 (declaring that "we do not believe that Congress intended RICO to apply to allegations of fraud such as this absent a showing of criminal activity which presents a 'more significant social threat'" (*citing Marshall–Silver Constr. Co., Inc. v. Mendel,* 894 F.2d 593, 597 (3d Cir.1990))); *Genty,* 937 F.2d at 912 (noting "Congress' overall purpose in passing RICO, to redress serious harm to the nation as a whole"); *Meade v. Meade,* Civ. No. 91–5515, 1991 WL 243539, at *5 (E.D.Pa. Nov. 18, 1991) ("This is a dispute between a small number of parties, and neither directly affects nor has wider implications for a large number of people. Actual and threatened societal injury is little, if any."), *aff'd,* 998 F.2d 1004 (3d Cir.1993) (table). *But see Tabas,* 47 F.3d at 1293 n. 17, 1297 n. 22;[6] *id.* at 1301 (Becker, J., concurring) (rejecting the no-tion that RICO's pattern requirement incorporates a "normative evaluation of the seriousness of the predicate acts" grounded on a showing of societal threat).

■ Support for this construction may be drawn from application of some fundamental legal doctrines, and from analogies to similar legislative schemes. As a general principle, the law authorizes the recovery of punitive damages only when the injury complained about is produced by extreme misconduct whose effects transcend private interests, not only damaging a particular victim but causing or threatening more generalized harm to larger societal concerns. *See Huntington v. Attrill,* 146 U.S. 657, 667, 668, 13 S.Ct. 224, 36 L.Ed. 1123 (1892) (noting that the test whether a law is penal "is whether the wrong sought to be redressed is a wrong to the public or a wrong to the individual" and that in this context the terms "penal" and "penalty" are "commonly used as including any extraordinary liability to which the law subjects a wrongdoer in favor of the person wronged, not limited to the damages suffered"); *Ciraolo v. City of New York,* 216 F.3d 236, 245 (2d Cir.2000) (Calabresi, J., concurring) (noting that "while traditional compensatory damages are assessed to make the individual victim whole, [punitive] damages are, in a sense, designed to make society whole by seeking to ensure that all of the costs of harmful acts are placed on the liable actor"); *Murphy v. Household Fin. Corp.,* 560 F.2d 206, 209 (6th Cir.1977).

Consistent with this doctrine, Congress has enacted several statutes employing the same legislative scheme, treble damages provisions to encourage private lawsuits that in part serve punitive and deterrent

---

6. *Tabas* was an en banc decision in which the judgment of the Third Circuit reflected only a plurality opinion on the section of the decision that purportedly overruled *Marshall–Sil-* ver. *See Weaver v. Mobile Diagnostech, Inc.,* Civ. No. 02–1719, 2007 WL 1830712, at *14 (E.D.Pa. June 25, 2007).

functions. These laws all embody an expression that the wrongdoing legislated against demands an extreme civil remedy both in recognition of the gravity of the conduct and of the need to protect the general public from its particular harms. Typical of these provisions are those prescribed in the antitrust laws, after which RICO's civil remedy was modeled. *See Shearson/Am. Exp.*, 482 U.S. at 241, 107 S.Ct. 2332 ("Antitrust violations generally have a widespread impact on national markets as a whole, and the antitrust treble-damages provision gives private parties an incentive to bring civil suits that serve to advance the national interest in competitive economy.... RICO's drafters likewise sought to provide vigorous incentives for plaintiffs to pursue RICO claims that would advance society's fight against organized crime." (*citing Sedima*, 473 U.S. at 498, 105 S.Ct. 3275)); *Texas Indus.*, 451 U.S. at 639, 101 S.Ct. 2061 ("The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct ...."); *see also Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 485–86, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Lyons v. Westinghouse Elec. Corp.*, 222 F.2d 184, 189 (2d Cir.1955).

Because RICO's treble damages remedy serves a punitive and deterrent purpose, the statute implicitly incorporates this guiding principle. *See Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 851 (2d Cir.1987) (noting that one purpose of RICO's treble damages remedy "was to deter organized crime"); *Genty*, 937 F.2d at 914 (holding that RICO's treble damages provision serves predominantly a punitive purpose in part because of RICO's "overall purpose to thwart the generalized harm wrought by racketeering activity"); *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1141 (5th Cir.1988), *vacated on other grounds by Fryar v. Abell*, 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989).

#### c. *Normative Balancing*

To summarize, the multifactor analysis holds that the greater the elements of continuity—the number, duration, dimensions, degree, complexity, gravity or nature of the RICO predicate acts weighed as a whole—the greater is the likelihood that the unlawful conduct charged will define a pattern of racketeering activity sufficiently serious not only to produce injury to the victim, but also to cause public harm or pose threats to larger societal interests of the type and magnitude Congress contemplated in enacting RICO, and for which the law's severe punitive and deterrent purposes are justifiable.

The warrant for this test has been questioned on the ground that it calls for a normative balancing and a subjective judgment that lack explicit textual basis in the statute. *See Tabas*, 47 F.3d at 1301 (Becker, J., concurring). But the type of adjudication the multifactor analysis entails is not unlike other common analogous circumstances in which Congress leaves it to the courts to discern legislative intent and construe abstract terms through general guidance from contextual factors—such as the overall legislative scheme of a statute—that fundamentally rely on subjective evaluations. *See Texas Indus.*, 451 U.S. at 639, 101 S.Ct. 2061. Under the antitrust laws, for instance, courts, serving a gatekeeper function, routinely perform assessments of the extent of private and public harms, and make corresponding normative judgments, in determining whether a particular restraint of trade is unreasonable or whether, as in the words of Section 7 of the Clayton Act, the effect of a merger "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. The same concepts apply under common law principles in judicial rulings concerning whether a claim for pu-

nitive damages is adequately supported in a complaint, or warranted by the evidence produced in discovery, or whether a verdict awarding such damages is justifiable or excessive. *See, e.g., TVT Records v. Island Def Jam Music Group,* 412 F.3d 82, 94–96 (2d Cir.2005) (analyzing whether punitive damages were warranted by determining whether there was a sufficiently public component). And more generally, courts engage in similar evaluations of variable factors and tallying their relative values when performing the intangible aspect of analysis and judgment they often explain under the catchall rubric of "the totality of the circumstances."

### d. *Mail and Wire Fraud as Only Predicates*

The interplay of the pattern prerequisites as they define and limit RICO's application often comes sharply into focus in litigation, such as the instant action, in which the predicate acts the plaintiff asserts to support the existence of a pattern of racketeering involve only allegations of mail and wire fraud. A number of courts have noted that, for several reasons, mail and wire fraud are "unique" among the various RICO predicate acts. *See, e.g., U.S. Textiles,* 911 F.2d at 1268. Unlike the other criminal offenses the statute enumerates as racketeering, use of the mail or wires is not inherently criminal. *See* 18 U.S.C. § 1961(1). Thus, to find the necessary criminality in those activities requires substantive inquiry beyond the mere fact of the communication, ordinarily by reference to other relevant considerations such as the extent to which the mailings were part of an intentional scheme to defraud, and in fact deceived, the victim. And even in connection with an actual fraudulent scheme, there may be substantial innocent or incidental use of the mail or wires that may not relate to the any unlawful activity of the enterprise or that involves no decep-

tion of the plaintiff. *See Ashland Oil, Inc. v. Arnett,* 875 F.2d 1271, 1278 (7th Cir. 1989) (noting that the mail and wire fraud offenses at issue were "only tangentially related to the underlying fraud, and can be a matter of happenstance"). Some of these communications, even if integral to the alleged fraud, may be entirely intrastate, and thus if transmitted by wire would fall outside the scope of RICO. *See Cofacrèdit,* 187 F.3d at 243.

■ Moreover, virtually every ordinary fraud is carried out in some form by means of mail or wire communication. *See Al–Abood ex rel. Al–Abood v. El–Shamari,* 217 F.3d 225, 238 (4th Cir.2000) (noting that "[i]t will be the unusual fraud that does not enlist the mails and wires in its service at least twice.") (internal quotation marks and citations omitted). Thus, the potential for transforming garden-variety common law actions into federal cases is greater if grounded entirely on these predicates. For these reasons "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Efron v. Embassy Suites (Puerto Rico), Inc.,* 223 F.3d 12, 20 (1st Cir.2000).

In light of these concerns, in RICO cases that as predicate acts assert only mail and wire fraud, courts hold that a multiplicity of mailings "may be no indication of the requisite continuity of the underlying fraudulent activity" and thus "does not necessarily translate into a 'pattern' of racketeering activity." *U.S. Textiles,* 911 F.2d at 1268 (internal quotation marks and citations omitted); *Shields Enters., Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1295 (7th Cir.1992) ("Repeated mailings in furtherance of a single scheme to inflict one fraudulent injury may be no

indication of the underlying fraud's continuity."); *Airlines Reporting Corp. v. Aero Voyagers, Inc.,* 721 F.Supp. 579, 584–85 (S.D.N.Y.1989) (fifty acts of mail fraud furtherance of a simple, single-victim scheme held insufficient to constitute a pattern); *see also Vicom,* 20 F.3d at 781.

Consistent with the case law applying the multifactor continuity test, courts in this Circuit have held repeatedly that allegations of RICO violations involving solely mail and wire fraud or little other variety in the predicate acts, a limited number of participants or victims, a discrete scheme with a narrow purpose or a single property—as opposed to complex, multi-faceted schemes—are generally insufficient to demonstrate closed-ended continuity, and thus to satisfy to "pattern" element of a plausible RICO claim. *See, e.g., Lefkowitz v. Bank of NY,* No. 01 Civ. 6252, 2003 WL 22480049, at *8 (S.D.N.Y. Oct. 31, 2003) ("[S]chemes involving a single, narrow purpose and one or few participants directed towards a single victim do not satisfy the RICO requirement of a closed or open pattern of continuity"), *rev'd on other grounds,* 528 F.3d 102 (2d Cir.2007); *Weizmann Inst. of Science v. Neschis,* 229 F.Supp.2d 234, 257 (S.D.N.Y.2002) (holding that a scheme of four predicate acts of mail fraud committed by one participant against a limited number of victims in furtherance of a single fraudulent scheme aimed at stealing the assets of a foundation and its principal was too discrete and limited to satisfy closed-ended continuity); *Lopresti v. Merson,* No. 00 Civ. 4255, 2001 WL 1132051, at *13 (S.D.N.Y. Sept. 21, 2001) (holding that an alleged scheme of less than two years' duration and six wire fraud predicate acts with a unitary purpose did not support a finding of closed-ended continuity); *Feirstein v. Nanbar Realty Corp.,* 963 F.Supp. 254, 259 (S.D.N.Y.1997) (noting that in determining continuity, the court should not " 'limit its

consideration to the duration of the scheme, but should also look at the overall context in which the acts took place' ... including the number of victims and participants, and the number, variety and extent of the defendant's goals, and whether there are separate schemes.") (internal citations omitted); *Airlines Reporting,* 721 F.Supp. at 584–85; *see also Spool,* 520 F.3d at 184 (noting that conduct persisting for less than two years is insufficient to establish close-ended continuity particularly where the activities alleged " 'involved only a handful of participants' and do not involve a 'complex, multifaceted conspiracy' ") (citations omitted).

e. *Application*

■ Plaintiffs assert that the Management Defendants' fraudulent scheme involved over 100 instances of mail and/or wire fraud carried out in furtherance of looting RAK's assets and extending over a period of more than four years. While the temporal duration and relatedness of the predicate acts claimed may be enough to satisfy one aspect of the RICO pattern requirement, the Court finds that the factual pleadings are otherwise insufficient to satisfy the closed-ended continuity prong as elaborated above. First, the Court notes that insofar as Plaintiffs' RICO claims are grounded on mail and wire fraud, a multiplicity of such predicate acts without more does not necessarily constitute a pattern of racketeering activity. *See Spool,* 520 F.3d at 184; *Airlines Reporting,* 721 F.Supp. at 584–85; *see also U.S. Textiles,* 911 F.2d at 1268.

(i) *Particularity*

A finding of failure to adequately plead the continuity prong is warranted in this case for several reasons. Plaintiffs' reliance on "mail and/or wire fraud" as the predicate offenses, by operation of *Twom-*

*bly*'s plausibility test and the particularity requirement of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"), demands greater specificity in the pleadings. Such particularity would require more details regarding the alleged predicate acts in which each particular defendant was directly or indirectly involved or had responsibility, as well as information concerning where, when and by which defendant any representations involved in the alleged fraudulent scheme constituting deception of Plaintiffs were communicated by use of the mail and/or wires, and how such statements actually deceived Plaintiffs. *See* Fed.R.Civ.P. 9(b); *Knoll v. Schectman,* 275 Fed.Appx. 50, 51 (2d Cir.2008) (in civil RICO suit, applying Rule 9(b) to predicate acts of mail and wire fraud); *Anatian v. Coutts Bank (Switzerland), Ltd.,* 193 F.3d 85, 88 (2d Cir.1999).

In describing the details pertaining to the predicate acts of mail and wire fraud that comprise the alleged RICO scheme, Plaintiffs state that "the Management Defendants" transferred RAK funds "by mail and/or wire" to various vendors between 2001 and 2004 to pay for numerous personal expenses or other personal purposes, while booking the payments as legitimate RAK business expenses. Specifically, Plaintiffs itemize and attach documents for payments by mail and/or wire bills related to electricity, telephone, cable television glazier, air conditioning, heating, security, landscaping, plumbing, swimming pool, water and garbage removal services related to the Waywells' homes in Manhattan and Southampton. Thus, the pleadings do not indicate individually which of the three defendants actually engaged in the particular predicate acts of mail or wire fraud offenses that Plaintiffs allege constitutes a pattern of racketeering. Such "group pleading" does not comply with the requirements of RICO or the particularity standards of Rule 9(b).

In particular, lumping the defendants into collective allegations results in a failure to demonstrate the elements of § 1962(c) with respect to each defendant individually, as required. *See DeFalco v. Bernas,* 244 F.3d 286, 306 (2d Cir.2001); *United States v. Persico,* 832 F.2d 705, 714 (2d Cir.1987) (noting that the focus of § 1962(c) "is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise"); *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993) (declaring that "Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants' "); *see also Vicom,* 20 F.3d at 777–78. The particulars of these transactions are important not only to establish whether substantively each predicate act alleged constituted an offense within the meaning of the underlying wire/mail fraud statutes, but also whether, as to each defendant, the number, duration and timing of such offenses would be sufficient to satisfy the continuity element of the RICO pattern of racketeering requirement, as well as the statute of limitations.

#### (ii) *Waywell*

The Court notes, for example, that in itemizing and documenting the instances in which the Management Defendants used the mail and/or wires to transfer RAK funds to pay personal expenses in furtherance of the alleged fraudulent scheme, all except three of the transactions relate to the Waywells. (*See* Amend. Compl. ¶¶ 80–95). Reviewing the exhibits corresponding to these transactions it appears that most or all of the vendors, contractors or utilities to which RAK funds were transferred were local entities. Accordingly, to the extent these alleged fraudulent transfer of funds occurred solely by wire, which the pleadings do not clarify, the transactions

would be classified as intrastate and thus would not qualify as predicate acts for RICO purposes. *See Cofacrèdit,* 187 F.3d at 243; *Lopresti,* 2001 WL 1132051, at *13.

### (iii) *Costa and Errigo*

Of the balance of the transactions, two pertain to wire transfers of funds to Errigo (*see id.* ¶¶ 96–97), and one to Costa (*see id.* ¶ 98). Certainly, insofar as these acts relate only to Errigo and Costa, one or two predicate offenses spread out over a period of over four years would fail the continuity prong on temporal grounds alone, not taking into account multiple other considerations that bear upon the existence of a sufficient pattern of racketeering. *See GICC,* 67 F.3d at 467; *Weizmann Inst.,* 229 F.Supp.2d at 257; *Lopresti,* 2001 WL 1132051, at *13. Moreover, as in the case of Waywell, there is no clear indication that the wire transfers were interstate.

### (iv) *Contextual Assessment*

Rather than a pattern of racketeering sufficient to satisfy the requirements of the statute, what Plaintiffs portray is essentially a single, relatively simple fraudulent scheme with a single purpose: to deceive and steal from two identified victims: Gross and RAK, 90 percent of which was owned by Gross. And the participants were all employees of RAK, a chief executive and two underlings—the comptroller and a bookkeeper. The predicate acts were all identical—mail and/or wire fraud; at bottom there was no variety in the underlying transactions. As described in the amended complaint, Waywell looted the assets of RAK and used the funds to pay numerous personal expenses. Similarly, Costa and Errigo allegedly made improper payments to themselves and relatives. Moreover, no threat of continuing or renewed criminal activity existed at the end of the alleged scheme because RAK

ceased doing business when the Premises were sold in September 2004. *See Spool,* 520 F.3d at 185–86; *Cofacrèdit,* 187 F.3d at 244.

Viewed as whole, Defendants' scheme as pled entailed a single goal: to steal from Gross and RAK. And the aim of all of the thefts appears to have been to advance the purposes and personal gains of each of the Management Defendants individually rather than to promote the shared objectives of the common racketeering enterprise as defined by Plaintiffs. Thus, applying the various factors the Second Circuit holds relevant to a determination of closed-ended continuity, the Court concludes that the proposed Amended Complaint fails to allege sufficient facts to satisfy the pattern element of a plausible RICO claim. *See Spool,* 520 F.3d at 184; *Cofacrèdit,* 187 F.3d at 242; *GICC,* 67 F.3d at 467.

Although not as a distinct factor, but merely as a contextual and analytic point of reference to RICO's overall framework, the Court notes that beyond the financial injuries to Gross and RAK that Plaintiffs claim, there is no indication that the criminal activities encompassed by the alleged scheme to defraud Gross and RAK produced any manifest public harm—such as hurting competition, undermining law enforcement, fostering violence, or deceiving innocent public investors—or that the predicate acts posed any other threat to larger societal interests of the dimensions and degree that would justify RICO's extraordinary mandatory treble damages remedy. *See* Statement of Findings and Purpose, Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 922, 922–923 (1970); *Turkette,* 452 U.S. at 591–92, 101 S.Ct. 2524 (citing RICO legislative history expressing congressional intent to deal with individuals who, through criminality, "constitute such a serious threat to the economic well-being of the Nation")

(*quoting* S.Rep. No. 91–617, at 79 (1969)); *Malley–Duff,* 483 U.S. at 151–52; *Genty,* 937 F.2d at 912–14. What Plaintiffs' proposed amended pleadings describe amounts merely to ordinary claims of common law fraud and other state law causes of action for which state remedies provide adequate redress. Like numerous other courts presented with similar circumstances, the Court doubts that Congress designed RICO's draconian sanctions to reach a simple fraudulent scheme, such as that asserted here, which relies solely on the use of mail or wires to inflict or threaten relatively limited injury only to the narrow and localized private interests of a few victims.

### 2. *Causation of Injury by an Enterprise*

#### a. *Elements*

▓▓▓▓ In addition to relatedness and continuity, a RICO claim must satisfy an element of causation. This standard requires a showing of "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Securities Investor Prot. Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). In turn, as it pertains to § 1962(c), a plaintiff must demonstrate injury in his property or business that stems from a pattern of racketeering activity through which the defendant commits criminal acts by conducting or participating in the conduct of the affairs of any "enterprise" engaged in interstate or foreign commence. *See* 18 U.S.C. §§ 1962(c); *Cedric Kushner Promotions Ltd. v. King,* 533 U.S. 158, 161, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001). To establish the "enterprise" requirement, the plaintiff must show "the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric,* 533 U.S. at 161, 121 S.Ct. 2087.

The enterprise, the Supreme Court has explained, "is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct." *Turkette,* 452 U.S. at 583, 101 S.Ct. 2524. The existence of an enterprise may be proved "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.*

Further, an "enterprise" within the purview of RICO encompasses two types of organizations: "legal entities" such as corporations and partnerships, and "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *Turkette,* 452 U.S. at 581–82, 101 S.Ct. 2524. In consequence, this definition includes both legitimate and illegitimate enterprises. *See Turkette,* 452 U.S. at at 580, 101 S.Ct. 2524. These definitional rules further elaborate the congressional concerns that the legislation evinces. From them two principles emerge that are reflected in the activities the statute sought to reach and the interests it sought to protect by the concept of "enterprise" as embodied in 18 U.S.C. §§ 1962(a)-(c): (1) the infiltration and corruption of legitimate enterprises such as corporations or unions by criminals for unlawful purposes and the use of such entities as vehicles in furtherance of predicate offenses; and (2) the organization or existence of illegitimate entities used for criminal purposes. *See Turkette,* 452 U.S. at 591, 101 S.Ct. 2524. In either event, the criminal activities conducted by the specified enterprise causes injury to the plaintiff's business or property in a manner also detrimental to the public interest. *See Cedric* 533 U.S. at 165, 121 S.Ct. 2087 (noting that RICO's legislative history reflects not only "the importance of undermining organized crime's influence upon legitimate busi-

nesses but also ... the need to protect the public from those who would run 'organization [s] in a manner detrimental to the public interest.' ") (*quoting* S.Rep. No. 91–617, at 82); *see also Reves v. Ernst & Young*, 507 U.S. 170, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (holding that to conduct or participate in the conduct of the affairs of an enterprise for the purposes of § 1962(c) "one must participate in the operation or management of the enterprise itself.").

In some circumstances, which generally apply to the activities of "outsider" persons covered by §§ 1962(a) and (b), the enterprise, whether legal or illegal, becomes the victim or target of the defendants' racketeering purposes and activities. In other cases, addressed by § 1962(c), the enterprise itself becomes the illegal tool or vehicle of the defendants, generally insider employees of the entity and any associated outsiders who use the enterprise to engage in racketeering activities through their operation or management of the affairs of the enterprise itself. *See Cedric*, 533 U.S. at 162, 121 S.Ct. 2087 (noting that "the person and the victim, or the person and the tool, are different entities, not the same").

 In sum, a central aspect of the causation element under § 1964(c) is to establish that the injury to business or property that the plaintiff complains of must derive from the racketeering activities of the defendants, functioning as a continuing unit and for a common purpose in conducting or participating in the operation or management of the affairs of the relevant "enterprise." By this analysis, defendants who allegedly constitute an illegal enterprise and engage in predicate offenses in furtherance of the defendants' own affairs or purposes, as opposed to the affairs or purposes of their common "enterprise," would fail to satisfy the requirements of RICO. *See Reves*, 507 U.S. at 185, 113 S.Ct. 1163 (noting that RICO liability "depends on showing that the defendants conducted or participated in the conduct of the *'enterprise's* affairs,' not just their *own* affairs") (emphasis in original); *Tenamee v. Schmukler*, 438 F.Supp.2d 438, 449 (S.D.N.Y.2006).

b. *Application*

 In the case at hand Plaintiffs assert that the Management Defendants as a group constituted "an association-in-fact 'enterprise' " directed and controlled by Waywell.[7] (Amend. Comp. ¶ 75). They claim as well that at all relevant times RAK itself also constituted an "enterprise" because "it was the means through which the Management Defendants carried out their racketeering activity." (*id.* ¶ 76). Plaintiffs' characterization of the enterprise element presents several conceptual issues. First, the RICO enterprise Plaintiffs describe comprises not one but two separate organizations—an illegal entity of the Management Defendants functioning as a unit to engage in racketeering activities, as well as the legitimate entity of RAK itself, of which all of the Management Defendants were employees and which they used as the means to carry out racketeering activities. In the alternative, Plaintiffs' allegations may be read as essentially positing the existence of a RICO enterprise operating within another RICO enterprise. Either way, these allegations blur the necessary distinction between the "person" who unlawfully conducts the affairs of an "enterprise" and the enterprise itself. To this extent, the pleadings raise substantial confusion as to who constitutes

---

**7.** As noted above, because this action abated as to Errigo by reason of her death, the Court assesses the viability of Plaintiffs' enterprise theory only in light of the allegations relating to Waywell and Costa.

"the person and the victim, or the person and the tool." *Cedric*, 533 U.S. at 162, 121 S.Ct. 2087. Under the § 1962(c) jurisprudence, these entities must be different, not the same. *See id.*

Positing the Management Defendants as the RICO enterprise raises other pleading deficiencies. Specifically, the criminal scheme Plaintiffs ascribe to the illegal entity appears to involve discrete transactions in which each of the three persons engaged in what Plaintiffs themselves characterize as "self-dealing," the intended victims of which were solely Gross and RAK. (Amend. Compl. ¶¶ 99–100.) For example, Plaintiffs enumerate multiple instances, supported by documentary exhibits as discussed above, in which the Management Defendants allegedly used the mails and/or wires to carry out transfers of RAK funds to numerous vendors and contractors intended as payments of bills for services and other personal expenses that actually related to Waywell's personal debts and to the Waywells' residences in Manhattan and Southampton, and that were booked in RAK's accounts as legitimate business expenses of RAK. (*See id.* ¶¶ 80–95.) Similarly, as to Errigo and Costa, Plaintiffs specify two instances in which RAK funds were allegedly transferred to Errigo and her husband, and in one instance to Costa, for unauthorized personal purposes, though the payments were recorded in RAK's books as legitimate business expenses. (*See id.* ¶¶ 96–98.)

The gist of these transactions is that each of the Management Defendants was involved in swindling and looting RAK for his or her own benefit. To this extent Plaintiffs' factual allegations demonstrate that the Management Defendants were participating in or conducting their *own* affairs rather than the affairs of an illegal enterprise constituted of the Management Defendants as Plaintiffs defined it; in oth-er words, Plaintiffs have demonstrated that Management Defendants were not functioning as a continuing unit for a common purpose of the alleged enterprise. *See Turkette*, 452 U.S. at 583, 101 S.Ct. 2524. Nor is there any indication that in committing the alleged acts of mail and/or wire frauds the Management Defendants were engaging in a regular way of conducting RAK's ongoing legitimate business with the company's customers. *See Tabas*, 47 F.3d at 1295 (*citing H.J. Inc.*, 492 U.S. at 243, 109 S.Ct. 2893 and applying by analogy a test for open-ended continuity stated there). Rather, the alleged scheme Plaintiffs portray suggest individual acts of self-dealing by each of the Management Defendants, or at best separate parallel acts between Waywell and Costa, Waywell and Errigo, and/or Costa and Errigo— again each in furtherance of his or her own affairs rather than the affairs of the enterprise Plaintiffs allege under either of their enterprise theories. *See Feinberg v. Katz*, No. 99 Civ. 0045, 2002 WL 1751135, at *15 (S.D.N.Y. July 26, 2002) (dismissing an amended complaint where the pleadings did not adequately demonstrate that two individuals constituting an alleged association-in-fact enterprise worked together as a continuing unit for the common purpose of looting a business).

Accordingly, under either formulation, Plaintiffs' allegations concerning the existence of a RICO "enterprise" fails to demonstrate the requirements of the statute.

### 3. *Statute of Limitations*

Defendants also argue that the RICO claims should be dismissed as well based on the statute of limitations. The Court need not rule on this defense because it has found adequate deficiencies in the Amended Complaint that warrant dismissal on the substantive grounds addressed above. However, if the pleadings were to

survive a substantive analysis, the Court finds that a substantial basis exists to support dismissal of this action as time-barred.

RICO's statute of limitations is four years. *See Malley–Duff,* 483 U.S. at 156, 107 S.Ct. 2759. The action accrues and the limitations clock begins to run from the date that the plaintiff knew or should have known of his injury. *See Rotella v. Wood,* 528 U.S. 549, 554, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). The original complaint in this action was filed on November 5, 2008. Thus, the statute of limitations would bar any alleged violations that occurred more than four years prior to the commencement of this action, or November 5, 2004. Here, all of the activities Plaintiffs describe as constituting RICO violations occurred prior to the sale of the Premises in September 2004, thus predating the date when the period of limitations commenced.

A majority shareholder or principal of a corporation involved in the operations of the business "cannot seriously contend" that he did not know about or could not reasonably have discovered RICO violations he complains about long after the expiration of the statute of limitations. *Feinberg,* 2002 WL 1751135, at *9. As the owner of 90 percent of RAK, a principal and one of the directors of the corporation, Gross would be hard-pressed to seriously maintain that, prior to commencing this lawsuit, he was unable to discover the unlawful activities by which he claims the Management Defendants violated RICO. However, because this matter would be best decided with the support of a fuller factual record, the Court will not address it further.

## C. *RICO CONSPIRACY*

The dismissal of a RICO action because the substantive claims are defi-

cient compels that related charges under § 1962(c) of conspiracy to violate RICO also must fail. *See Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1064 (2d Cir.1996), *vacated on other grounds,* 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998). Accordingly, by reason of the Court's conclusion that Plaintiffs have failed to state a sufficient substantive claim of RICO violations, their allegations of RICO conspiracy must also be dismissed.

## IV. *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the request of plaintiffs Herman Gross and R.A.K. Tennis Corp. ("Plaintiffs") to file a proposed First Amended Complaint (Docket No. 42) is DENIED, and the motions of Defendants' Roderick Waywell and Lisa Waywell (Docket No. 44) and of defendant Hugo Costa (Docket No. 43) opposing Plaintiffs' filing the proposed First Amended Complaint and renewing their motions to dismiss the complaint herein are GRANTED.

The Clerk of Court is directed to withdraw any pending motions and to close this case.

**SO ORDERED.**