06-4908
Port Dock  v. Oldcastle

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2006

(Argued: June 14, 2007          Decided: October 23, 2007)

Docket No. 06-4908-cv

-------------------------------------------x

PORT DOCK & STONE CORPORATION,
GOTHAM SAND & STONE CORP. and
PORT DOCK HOLDINGS CORP.,

                Plaintiffs-Appellants,

          -- v. --

OLDCASTLE NORTHEAST, INC., CRH GROUP,
PLC AND TILCON INC.,

                Defendants-Appellees.

-------------------------------------------x

B e f o r e:   LEVAL, CALABRESI, and JOHN R. GIBSON,[*] Circuit
               Judges.


     Appeal from a final judgment of the United States District

Court for the Eastern District of New York (Denis R. Hurley,

Judge), granting motion to dismiss the complaint for failure to

state a claim on which relief can be granted.  We affirm.

                         WILLIAM G. KOPIT
                         JOHN R. SACHS, JR.,
                         Epstein Becker & Green, P.C., New York,
                         New York, for Plaintiffs-Appellants

---

     [*] The Honorable John R. Gibson, Circuit Judge, United States
Court of Appeals for the Eighth Circuit, sitting by designation.

JOHN R. FORNACIARI, ESQ.
Sheppard, Mullin, Richter & Hampton,
LLP, Washington, D.C., for Defendants-
Appellees

JOHN R. GIBSON, Circuit Judge.

Port Dock Holdings Corp., and its two subsidiaries, Port Dock & Stone Corp. and Gotham Sand & Stone Corp. (whom we will refer to collectively as Port Dock), appeal from the district court's dismissal of their antitrust claim against their erstwhile suppliers CRH, PLC, Oldcastle Northeast, Inc., and Tilcon, Inc. (known collectively as Tilcon).[1] Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., No. 05 Civ. 4292 (DRH) (ARL), 2006 WL 2786882 (E.D.N.Y. Sept. 26, 2006). Port Dock alleged that Tilcon monopolized the market for manufacturing crushed stone, or "aggregate," by buying out its only significant manufacturing competitor, Lone Star Industries. Before the Lone Star buyout, Port Dock bought aggregate from Tilcon and distributed it; after the buyout, Port Dock alleges that Tilcon refused to sell aggregate to Port Dock, thus depriving Port Dock of any source of supply and coercing it to sell its assets to

---

[1]The complaint alleges that Tilcon is a subsidiary of Oldcastle, which is a subsidiary of CRH. The defendants contend that Oldcastle was never served with a complaint, has therefore never made an appearance in this action, and is not a party to this appeal. Oldcastle joined the motion to dismiss, and the district court dismissed the complaint as to all defendants. Oldcastle does not move to dismiss this appeal, and in view of our affirmance of the dismissal, we need not belabor the point.

2

Tilcon at a sacrifice. The district court held that Port Dock did not show that it had suffered an antitrust injury. We affirm.

Because this case was decided on the pleadings, we take the facts as stated in the complaint. Tilcon and its predecessor owned quarries and were in the business of producing aggregate. Port Dock acted as a distributor, buying its aggregate from Tilcon and Tilcon's predecessor and reselling in Long Island and the New York metropolitan area. According to the complaint, by the 1980s, Tilcon produced about 85% of the supply of aggregate in the market area, with only one significant competitor, New York Trap Rock, which had about 10% of the market share. The complaint alleged that in this two-supplier market, Tilcon attempted to raise prices unilaterally in 1988, but was forced to rescind when New York Trap Rock did not follow suit. Even though Port Dock was Tilcon's largest customer, in the early 1990s Tilcon sought to compete with Port Dock in the distribution market by soliciting Port Dock's customers and selling them aggregate at prices below Tilcon's actual cost. In 1997, Tilcon acquired New York Trap Rock's parent company, Lone Star Industries, and so captured Port Dock's only alternative source of supply. In 1999, Tilcon announced that it would no longer sell aggregate to Port Dock. Tilcon proposed to purchase Port Dock's assets; because Port Dock had no alternative source of

3

supply, it had no choice but to sell on Tilcon's terms, at a sacrifice price.  Within weeks of closing the purchase of Port Dock's assets, Tilcon raised prices to its customers.  Port Dock filed for bankruptcy in 2003.

Port Dock filed this antitrust complaint in September 2005, alleging (1) that Tilcon had attempted to monopolize the "relevant market" in violation of section 2 of the Sherman Act[2]; (2) that Tilcon had in fact monopolized the market; and (3) that Tilcon had unlawfully acquired businesses with the effect of substantially limiting competition and tending to create a monopoly in violation of section 7 of the Clayton Act.[3]  Port

---

[2]Section 2 of the Sherman Act, 15 U.S.C. § 2, provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

[3]Section 7 of the Clayton Act, 15 U.S.C. § 18, provides:

No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to

4

Dock also alleged state law claims for tortious interference with business relations and unfair competition. Port Dock defines the relevant product market as the market for aggregate for use in the construction, paving, and concrete manufacturing industries, and the relevant geographic market as Long Island and the New York City metropolitan area, as well as counties in northern New Jersey.[4]

Tilcon moved to dismiss for failure to state a claim. The district court held that Port Dock had not pleaded an antitrust injury because its injury resulted from Tilcon's vertical integration into the distribution market, rather than from Tilcon's acquisition of its competitor in the manufacturing

---

lessen competition, or to tend to create a monopoly.

No person shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of one or more persons engaged in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition, of such stocks or assets, or of the use of such stock by the voting or granting of proxies or otherwise, may be substantially to lessen competition, or to tend to create a monopoly.

[4]Although both in its complaint and in its brief before this Court Port Dock describes the relevant product market as the "market for the distribution of aggregate," its factual allegations extend to monopolization of the market for production of aggregate as well.

5

market.  Port Dock & Stone Corp., 2006 WL 2786882, at *9.  The court also held that Port Dock was not an efficient enforcer of the antitrust laws because Port Dock was not a participant in the market allegedly monopolized.  Id. at *10.  Having dismissed the federal claims, the court declined to exercise supplemental jurisdiction over the state law claims and so dismissed those as well.  Id.

We review the district court's dismissal of a complaint under Fed. R. Civ. P. 12(b)(6) de novo, taking as true the factual allegations of the complaint, but giving no effect to legal conclusions couched as factual allegations.  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007).  The plaintiff's factual allegations must be enough to give the defendant fair notice of what the claim is and the grounds upon which it rests.  Id.  In last term's Twombly decision, itself an antitrust case, the Supreme Court held that a complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion.  Id. at 1966; see Iqbal v. Hasty, 490 F.3d 143, 155-58 (2d Cir. 2007) (intepreting Twombly as instituting a "plausibility standard," requiring amplification of facts in certain contexts).

On appeal, Port Dock contends that it had antitrust standing because it was both a customer and competitor in the relevant

geographic market for aggregate.  Port Dock argues it was Tilcon's customer at the production level and Tilcon's competitor at the distribution level.  Port Dock argues that by acquiring Lone Star Industries, Tilcon achieved a monopoly at the production level, then expanded vertically into the distribution level and refused to deal with Port Dock.  The loss of the only alternative supplier at the production level rendered Port Dock utterly dependent on Tilcon, which then cut off Port Dock's supply of aggregate.

Although Port Dock's substantive claims arise under section 2 of the Sherman Act and section 7 of the Clayton Act, the private right of action is provided by section 4 of the Clayton Act, 15 U.S.C. § 15.  Section 4 confers standing on private plaintiffs in sweeping language: "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained . . . ."  Despite the broad language of the statute, courts have carefully parsed antitrust standing in order to avoid counter-productive use of antitrust laws in ways that could harm competition rather than protecting it.  See Serpa Corp. v. McWane, Inc., 199 F.3d 6, 10 (1st Cir. 1999).

Antitrust standing is distinct from constitutional standing, in which a mere showing of harm in fact will establish the

necessary injury.  Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 535 n.31 (1983). In addition to injury in fact to the plaintiff's business or property caused by the antitrust violation, 15 U.S.C. § 15, antitrust standing for a private plaintiff requires a showing of a special kind of "antitrust injury," as well as a showing that the plaintiff is an "efficient enforcer" to assert a private antitrust claim.  See Associated Gen Contractors, 459 U.S. at 537-45; Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc., 467 F.3d 283, 290-91 (2d Cir. 2006) (suitability of plaintiff evaluated by efficient enforcer factors: (1) whether the violation was a direct or remote cause of the injury; (2) whether there is an identifiable class of other persons whose self-interest would normally lead them to sue for the violation; (3) whether the injury was speculative; and (4) whether there is a risk that other plaintiffs would be entitled to recover duplicative damages or that damages would be difficult to apportion among possible victims of antitrust injury); see generally 2 Phillip E. Areeda et al., Antitrust Law, ¶ 335 (2d ed. 2000).

The necessary "antitrust injury" is an injury attributable to the anticompetitive aspect of the practice under scrutiny. See Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990).  Showing such an injury requires identifying the practice

complained of and the reasons such a practice is or might be anticompetitive. For instance, in Atlantic Richfield, even where a retail competitor was actually injured due to the effects of an illegal vertical agreement among an oil company and its retailers setting a maximum price for gasoline, the Supreme Court held the competitor had no antitrust injury. The Court said the reason vertical maximum price fixing was illegal[5] was that it would restrain non-price competition by the dealers subject to artificial price caps, preventing the dealers from offering the kind of service they might otherwise choose to provide and depriving customers of such superior service. Id. at 336-37. Competitors who were not bound by the resale price arrangement were not injured by the anticompetitive aspect of vertical maximum price fixing, since they could offer superior service if they liked. Nevertheless, those competitors might in fact be hurt by the price fixing in another way-they might make less money because they had to charge lower prices to compete with an artificially capped price. Id. at 338. Despite their actual injury from price competition, the competitors would not have antitrust injury, for it is axiomatic that the antitrust laws do

---

[5]Since Atlantic Richfield, the Supreme Court has abrogated the per se rule against vertical maximum price fixing, State Oil Co. v. Khan, 522 U.S. 3, 18 (1997), and later, the per se rule against vertical minimum price fixing, Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 127 S. Ct. 2705, 2710 (2007). Such arrangements are now tested under the rule of reason. Khan, 522 U.S. at 22; Leegin, 127 S. Ct. at 2720.

not protect a competitor against competition.  Id.; see also Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc., 429 U.S. 477, 488 (1977).

Port Dock argues that it was a customer and a competitor in the market for aggregate and therefore should have antitrust standing.  However, Port Dock's argument that competitors and customers have antitrust standing is oversimplified, as we see from Atlantic Richfield and other cases in which competitors lacked standing.  495 U.S. at 338; accord Cargill, Inc. v. Montfort of Colo., Inc., 479 U.S. 104, 122 (1986); Pueblo Bowl-o-Mat, 429 U.S. at 488; see also Novell, Inc. v. Microsoft Corp., — F.3d — , 2007 WL 2984372, at *6-8 (4th Cir. Oct. 15, 2007) (declining to adopt bright line rule that only consumers or competitors have antitrust standing).  We can ascertain antitrust injury only by identifying the anticipated anticompetitive effect of the specific practice at issue and comparing it to the actual injury the plaintiff alleges.

In this case, Tilcon's alleged anticompetitive practices are (1) acquisition of its only major competitor, resulting in a monopoly in the production of aggregate in 1997, followed by (2) vertical integration into the distribution level and refusal to deal with Port Dock in 1999, leading to a second Tilcon monopoly at the distribution level.

First, we must examine the danger to competition to be

10

expected from Tilcon's acquisition of Lone Star for the alleged purpose of monopolizing production of aggregate and compare it to Port Dock's alleged injury. The danger to customers from monopolization of the production level is the danger that the monopolist will raise prices and restrict output. "[T]he rationale for condemning a merger lies in its potential for supracompetitive pricing, not in its potential for cost savings and other efficiencies." Fla. Seed Co. v. Monsanto Co., 105 F.3d 1372, 1375 n.3 (11th Cir. 1997) (quoting Phillip Areeda & Herbert Hovencamp, Antitrust Law ¶ 381 (rev. ed. 1995)). Port Dock, although it had formerly been a customer of Tilcon's, did not suffer an injury from increased prices. Indeed, Port Dock's counsel conceded at oral argument that after the acquisition of Lone Star, Tilcon did not raise prices to Port Dock.[6] Instead, Port Dock's grievance is that Tilcon refused to sell to it at all. In other words, Port Dock is a former customer.

---

[6]In fact, counsel asserted at oral argument that the opposite was true–that Tilcon had cut prices to customers (other than Port Dock) to below cost. However, examination of the complaint shows that the one episode of below-cost pricing was alleged to have occurred in connection with a 1991 dispute between Tilcon and Port Dock, rather than to have occurred after Tilcon acquired its production monopoly. After acquiring its monopoly, Tilcon is alleged to have increased prices to its remaining customers (but not Port Dock), as one would expect it to do.

To the extent that Port Dock relies on predatory pricing alleged to have happened in 1991, it appears on the face of the complaint that any possible claim would be barred by the four-year statute of limitations. 15 U.S.C. § 15b.

Where a defendant is alleged to have acquired other firms in order to achieve monopoly power at the manufacturing level of a product market, dealers or distributors terminated in the aftermath do not have standing to assert claims under section 2 of the Sherman Act or section 7 of the Clayton Act for monopolization at the manufacturing level. See G.K.A. Beverage Corp. v. Honickman, 55 F.3d 762, 766-67 (2d Cir. 1995) (§ 2); see also Norris v. Hearst Trust, —F.3d—, 2007 WL 2702941, at *9 (5th Cir. Sept. 18, 2007)(§ 2); Serpa Corp., 199 F.3d at 11-12 (§ 2 and § 7); Fla. Seed Co., 105 F.3d at 1375 n. 3 (§ 2); John Lenore & Co. v. Olympia Brewing Co., 550 F.2d 495, 500 (9th Cir. 1977) (§ 7); A.G.S. Elecs., Ltd. v. B.S.R., Ltd., 460 F. Supp. 707, 710-711 (S.D.N.Y.) (§ 7), aff'd, 591 F.2d 1329 (2d Cir. 1978). Dealers in this situation lack standing because their particular injury was not caused by an exercise of the defendant's newly acquired power to raise prices. See generally Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 464 (1992) (defining market power as the ability of a single seller to raise price and restrict output); AD/SAT v. Associated Press, 181 F.3d 216, 227 (2d Cir. 1999) (defining monopoly power as ability to sustain price substantially above competitive level for significant time). Instead, the dealer's injury was caused by the manufacturer's decision to terminate their relationship, something the manufacturer could have just as well done without

12

having monopoly power.  G.K.A. Beverage, 55 F.3d at 767 (reasoning that acquired bottler could have terminated distributors before acquisition); Serpa Corp., 199 F.3d at 12 ("This loss [of a distributorship] is neither connected with, nor resulted from, defendant's market power . . . ."); John Lenore & Co., 550 F.2d at 500 ("The [post-acquisition] terminations [of distributors] were an incidental matter which the merger may have made possible, but certainly did not cause.").  Those who would suffer from the defendant's exercise of monopoly power would be the dealers or consumers who were forced to buy at higher prices (or inferior quality) because the defendant had acquired the market power to charge monopoly prices.  See Precision Surgical, Inc. v. Tyco Int'l Ltd., 111 F. Supp. 2d 586, 590 & n.9 (E.D. Pa. 2000) ("Here, there is no overcharge issue [regarding terminated distributor] because the distributors no longer deal in defendants' products.  The only potential down-stream victim of a monopoly overcharge would be hospitals and doctors purchasing directly from the manufacturer.")  Therefore, Port Dock did not plead an antitrust injury from Tilcon's alleged monopolization of the production level.

Next, Port Dock alleges that Tilcon monopolized the distribution level of the aggregate market by expanding vertically into the distribution level and later refusing to deal with Port Dock.  Vertical expansion by a monopolist, without

13

more, does not violate section 2 of the Sherman Act.  Belfiore v. N.Y. Times Co., 826 F.2d 177, 181 (2d Cir. 1987).

Here, in addition to vertical expansion by a monopolist, Port Dock alleges the monopolist refused to deal with a former distributor.  A refusal to deal is generally not unlawful unless it is done for the purpose of monopolization.  United States v. Colgate & Co., 250 U.S. 300, 307 (1919); Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 189 (2d Cir. 1992).  The absence of a legitimate business purpose for the defendant's refusal to deal has been seen as circumstantial evidence of improper intent.  See Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 608 (1985); Otter Tail Power Co. v. United States, 410 U.S. 366, 378 (1973); Eastman Kodak Co. v. So. Photo Materials Co., 273 U.S. 359, 375 (1927); Morris Commc'ns Corp. v. PGA Tour, Inc., 364 F.3d 1288, 1295 (11th Cir. 2004) (anticompetitive conduct is "conduct without a legitimate business purpose that makes sense only because it eliminates competition") (internal quotation marks omitted).

Our cases establish that when a monopolist has acquired its monopoly at one level of a product market, its vertical expansion into another level of the same product market will ordinarily be for the purpose of increasing its efficiency, which is a prototypical valid business purpose.  In G.K.A. Beverage Corp. v. Honickman, 55 F.3d 762 (2d Cir. 1995), soft-drink distributors

14

alleged that a bottler, Honickman, had monopolized the upstream market by acquiring its principal competitor and had then expanded that monopoly into the distribution level. This Court held that there was no anticompetitive effect from this second-level monopolization. Id. at 767. We affirmed dismissal of the G.K.A. Beverage complaint for failure to state a claim. Id. at 768. The rationale for our ruling was that a monopolist can only extract one monopoly profit on a product; once it enjoys a monopoly at one level of the product's market, there is no further monopoly profit to be had from its expansion vertically. Accordingly, once Honickman had achieved an upstream monopoly, it had no incentive to behave anticompetitively at the distribution level: "Once having achieved the alleged bottling monopoly, therefore, [the bottler's] sole incentive is to select the cheapest method of distribution." Id. at 767. Since Honickman had no anticompetitive incentive to create a downstream monopoly, the allegations of the complaint made it more likely that Honickman chose to eliminate the distributors to increase efficiency, rather than for the purpose of monopolization. Id. Therefore, a complaint pleading that a defendant expanded vertically and as a result, decided to discontinue doing business with its erstwhile trading partners at the next level down, does not plead an actionable refusal to deal. Such allegations are equally consistent with the idea that the monopolist expected to

15

perform the second level service more efficiently than the old trading partners and thus undertook the vertical integration for a valid business reason, rather than for an anticompetitive one.

The same reasoning, but slightly different facts, underlay this Court's decision in E&L Consulting Ltd. v. Doman Indus., Ltd., 472 F.3d 23 (2d Cir. 2006), cert. denied, No. 06-1549, 2007 WL 1494779 (U.S. Oct. 1, 2007), where a lumber production monopolist allegedly cut off a distributor and created a distribution-level monopoly in another dealer. We affirmed dismissal of the complaint, holding that there was no anticompetitive incentive for the lumber producer to create a monopoly in retail distribution of its product. Id. at 30. The facts pleaded suggested that the producer acted for the purpose of increasing efficiency in some way: "Like any seller of a product, a monopolist would prefer multiple competing buyers unless an exclusive distributorship arrangement provides other benefits in the way of, for example, product promotion or distribution." Id. Following this reasoning, the allegations of an exclusive distribution agreement between the monopolist and the new dealer did not state a cause of action under section 2 of the Sherman Act. Id. at 31.

In light of G.K.A. Beverage and E&L Consulting, the facts alleged by Port Dock do not establish that the vertical expansion and the accompanying refusal to deal with Port Dock were

16

anticompetitive or, therefore, that they stated a claim for violation of section 2 of the Sherman Act at the distribution level of the aggregate market.

There may be special circumstances in which a monopolist's vertical expansion could be anticompetitive, such as where the monopolist uses the vertical integration to facilitate price discrimination, to avoid government regulation of price at one level, or to preserve its production monopoly by putting up entry barriers to new competitors seeking to enter at the production level. See Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 191 (2d Cir. 1992); Paschall v. Kansas City Star Co., 727 F.2d 692, 702 (8th Cir. 1984) (en banc); Byars v. Bluff City News Co., 609 F.2d 843, 861-62 (6th Cir. 1980); see generally Note, Refusals to Deal by Vertically Integrated Monopolists, 87 Harv. L. Rev. 1720, 1727-28 (1974). Port Dock has not alleged any such circumstance that would make Tilcon's vertical integration and refusal to deal with it anticompetitive. The complaint pleads no facts that would show that Tilcon's vertical expansion was for an anticompetitive purpose rather than for the purpose of improving efficiency. Since it is established law that mere vertical expansion by a monopolist plus refusal to deal with a former distributor, without more, does not establish anticompetitive monopolization, it was incumbent on Port Dock to plead further facts "plausibly suggesting" an anticompetitive

17

aspect to the refusal to deal. See Twombly, 127 S. Ct. at 1966 (since it is established that consciously parallel conduct of competitors is not sufficient to establish conspiracy, plaintiff must plead further facts plausibly suggesting conspiracy).

Port Dock relies on cases in which refusals to deal were found to be anticompetitive, but those cases are distinguishable because in each of them, the plaintiff plausibly suggested that the defendant had an economic incentive to exclude the competitor. Tilcon, in contrast, had no such incentive because it already enjoyed a monopoly at the production level. Port Dock relies on PrimeTime 24 Joint Venture v. NBC, 219 F.3d 92 (2d Cir. 2000), in which this Court held that a plaintiff stated antitrust injury from a concerted refusal to deal. There, the major television networks and their affiliated stations were alleged to have conspired to refuse to license copyrighted programs to the plaintiff satellite company, which wanted to buy the programs to package with alternative programming to transmit to consumers or to distributors. This Court held that the conspiracy's alleged object in refusing to sell programming was to deprive the satellite company of the tools it needed to compete with the networks, and the alleged anticompetitive effect was that the networks could maintain higher prices on their programming without the competition from alternative programming. Id. at 103-04. Thus, the plaintiff was competing with a number of

18

vertically integrated defendants, and the defendants had an economic incentive to exclude it from the market. The incentive to behave anticompetitively distinguishes PrimeTime 24 from this case, in which Tilcon was alleged to have successfully monopolized the market at one level of production, and thus had already vouchsafed its monopoly profit and had nothing to gain from excluding Port Dock from the distribution market.

Port Dock also cites Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985), in which a company that owned three ski mountains refused to deal with its rival that owned only one mountain. After years of voluntary cooperation in a joint venture in which the companies offered a package with access to all four mountains, the defendant changed course and refused to cooperate or even to allow the plaintiff to purchase ski passes at defendant's retail price in order to put together its own package. The evidence at trial showed that consumers preferred the four mountain package, but when deprived of the package, would bypass the plaintiff's mountain altogether. Id. at 605-08. As in PrimeTime 24, by refusing to deal with its rival, the defendant was able to eliminate competition from its rival and thereby gain market power. Moreover, the Supreme Court emphasized that there was no legitimate reason for the defendant to refuse to sell tickets to the plaintiff at the defendant's retail price, id. at 608-09, especially since the defendant had

19

found it commercially desirable to cooperate in offering packages with the plaintiff in the past, id. at 603. The absence of a legitimate business reason for the refusal to deal suggested that the reason for the defendant's action was intent to monopolize. Here, in contrast, our vertical integration cases show that Tilcon's expansion into distribution was most likely in pursuit of increased efficiency, and Port Dock has not alleged any facts that would plausibly suggest that Tilcon's purpose was anticompetitive. There was thus an apparent legitimate business reason for Tilcon's refusal to deal.

Port Dock also relies on Eastman Kodak Co. v. Image Technical Servs. Inc., 504 U.S. 451 (1992), which involved a claim of leveraging monopoly power over one product market into a distinct product market, id. at 483, rather than vertical integration in one product market, and so is not on point.

In sum, Port Dock lacks antitrust standing to assert a claim for monopolization of the aggregate market at the manufacturing level, and it has failed to allege a plausible claim of anticompetitive conduct at the distribution level. Therefore, the district court correctly found that it had failed to state a claim.

Port Dock asks that we remand with leave to replead, but it has not offered any pleading that would cure the deficiencies in the extant complaint. Without such a showing, we can only

20

conclude that repleading would be futile.  <u>See</u> <u>Cuoco v.</u>

<u>Moritsugu</u>, 222 F.3d 99, 112 (2d Cir. 2000) (request to replead

should be denied where repleading would be futile).

We affirm the district court's order dismissing the

complaint.

21