GEORGE B. DANIELS, United States District Judge:
*306 Plaintiff Jorge Yarur Bascuñan, as well as several entities he owns and controls (the "Bascuñan Entities"), bring this action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. , against Defendants Daniel Yarur Elsaca, several entities he owns and controls, and two of his associates, Cristián Jara Taito ("Jara") and Oscar Bretón Dieguez ("Bretón").[1] (Second Am. Compl. ("SAC"), ECF No. 76, ¶¶ 6-26.) Plaintiff alleges that Defendants violated and conspired to violate RICO by engaging in numerous predicate acts of racketeering activity, including mail fraud, wire fraud, bank fraud, money laundering, and violations of the Travel Act, with the purpose and intent of misappropriating millions of dollars Plaintiff inherited from his late parents in the late 1990s. (Id. ¶¶ 1-3, 185-234, 236-39.) Plaintiff also asserts several state law causes of action for unjust enrichment, constructive trust, and accounting. (Id. ¶¶ 186-234, 236-39, 241-45, 247-50, 252-58.)
Defendants previously moved to dismiss this action for lack of personal jurisdiction and failure to state a claim under RICO, among other grounds. (See Mot. to Dismiss, ECF No. 35; Mem. in Supp. of Mot. to Dismiss, ECF No. 36,) After this Court heard oral argument on the motion, but before a decision was rendered, the Supreme Court issued an opinion in RJR Nabisco, Inc. v. European Cmty. , --- U.S. ----, 136 S.Ct. 2090, 195 L.Ed.2d 476 (2016). In RJR Nabisco , the Court held, among other things, that RICO does not apply extraterritorially and a private party suing under RICO must therefore "allege and prove a domestic injury to business or property." Id. at 2111.
Applying a residence-based test for determining whether Plaintiff suffered a domestic injury, this Court found that Plaintiff had failed to allege an economic injury in the United States, as opposed to in Chile or the British Virgin Islands ("BVI"), where he and the Bascuñan Entities "reside."[2] See Bascuñan v. Elsaca (Bascuñan I ), No. 15 Civ. 2009 (GBD), 2016 WL 5475998, at *6 (S.D.N.Y. Sept. 28, 2016). Accordingly, this Court granted Defendants' motion to dismiss, id. at *7, from which Plaintiff timely appealed. (See Notice of Appeal, ECF No. 68.)
On appeal, the Second Circuit vacated Bascuñan I and remanded the case to this Court for further proceedings. See Bascuñan v. Elsaca (Bascuñan II ), 874 F.3d 806, 824-25 (2d Cir. 2017). In doing so, the Second Circuit held as a matter of first impression that "when a foreign plaintiff maintains tangible property in the United States, the misappropriation of that property constitutes a domestic injury." Id. at 814. On remand, this Court granted Plaintiff leave to amend his complaint to meet the new domestic injury pleading standards set forth in Bascuñan II . (See Order dated Dec. 13, 2017, ECF No. 75, at 1.)
Defendants now move to dismiss the SAC in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Mot. to Dismiss, ECF No. 84.) Defendants argue dismissal is warranted *307 because, among other things, the SAC fails to allege a domestic injury with respect to much of Defendants' alleged conduct. (See Mem. in Supp. of Mot. to Dismiss ("Mem."), ECF No, 85, at 19-21.) Defendants also contend that to the extent the SAC does allege a domestic injury under RICO, it impermissibly relies on an extraterritorial application of the RICO predicate statutes. (Id. at 21-24.) Finally, Defendants argue that the SAC fails to adequately allege a continuous pattern of racketeering activity, as required to state a claim under RICO. (See id. at 24-26.)
Because the SAC fails to allege a domestic injury, impermissibly relies on an extraterritorial application of RICO, and fails to adequately allege a continuous pattern of racketeering activity, Defendants' motion to dismiss is GRANTED.
I. FACTUAL BACKGROUND[3]
A. The Bascuñan Estate
Plaintiff, a citizen and resident of Chile, inherited a substantial family fortune (the "Bascuñan Estate") following the death of his parents in the 1990s. (SAC ¶¶ 7, 35.) The Bascuñan Estate consists largely of companies and assets owned by Plaintiff, including a substantial stake in Banco de Crédito e Inversiones ("BCI"), a Chilean bank formerly headed by Plaintiff's father and in which he held a controlling interest prior to his death. (Id. ¶ 35.)
Unable to manage his own finances due to various physical and emotional ailments, Plaintiff relied on a financial manager initially hired by his parents. (Id. ¶¶ 36-37.) In 1999, however, Plaintiff engaged his cousin, Defendant Elsaca, to manage the Bascuñan Estate. (Id. ¶¶ 37, 39.) Elsaca, also a citizen and resident of Chile, is an economist and licensed accountant by trade, and the former head of the Superintendencia de Valores y Seguros (de Chile), which the SAC describes as the Chilean equivalent of the U.S. Securities and Exchange Commission. (Id. ¶¶ 14, 37.) Plaintiff agreed to pay Elsaca an annual salary for managing the Bascuñan Estate. (Id. ¶ 39.)
Soon thereafter, Elsaca convinced Plaintiff to grant him a power of attorney ("POA") that conferred broad authority on Elsaca to manage the Bascuñan Estate and enter into transactions on its behalf. (Id. ¶ 40.) The POA did not provide Elsaca with any additional compensation for his services. (Id. ¶ 43.) Instead, Elsaca paid himself a monthly salary for managing the Bascuñan Estate, as he and Bascuñan had agreed. (Id. ) Plaintiff alleges that for the ten years Elsaca was charged with managing the Bascuñan Estate, he and his co-conspirators engaged in a multifaceted fraudulent scheme to misappropriate money, securities, and other assets from the Bascuñan Estate to the tune of approximately $70 million. (Id. ¶¶ 3, 45.)
B. Afghan Trust Misappropriation
One aspect of Defendants' alleged scheme involved the misappropriation of assets from one of Plaintiff's trusts. (Id. ¶ 46.) The Afghan Trust, as the trust was known, was established in 1998 and administered by J.P. Morgan in New York, and used to finance Plaintiff's charitable endeavors. (Id. ¶ 47.)
In 2001, after Elsaca took over the management of the Bascuñan Estate, he established the Capri Star Trust on Plaintiff's behalf using funds from the Afghan Trust. ( *308 Id. ¶ 48.) The Capri Star Trust was created and administered by UBS AG in New York and its stated purpose was also to finance Plaintiff's charitable undertakings. (Id. ) According to Plaintiff, however, the Capri Star Trust's true purpose was to enable Elsaca and his associates to divert money from the Afghan Trust to their own personal accounts in the United States and elsewhere in the form of sham fees. (Id. ¶ 50; id. Ex. A.)
The Capri Star Trust designated Elsaca as its investment advisor, entitling him to a fee set by the Trust Committee. (Id. ¶ 49.) The Trust Committee, whose sole members were Elsaca and his lawyer, non-party José Pedro Silva Prado ("Silva"), set the investment advisor's fee at 1% per annum of assets under management. (Id. ) Plaintiff alleges that Elsaca periodically authorized fund transfers from the Afghan Trust to the Capri Star Trust in order to generate higher investment management fees for himself. (Id. ¶¶ 52-53.) More specifically, Plaintiff alleges that although Elsaca did not actually provide any such investment advice, he and/or Silva transferred more than $2.7 million from the Capri Star Trust to accounts under Elsaca's control in New York and Switzerland in the form of sham investment management fees. (Id. ¶¶ 53-56; id. , Ex. A.) Elsaca and his agents allegedly authorized these fraudulent transfers by wires or mail to UBS employees in New York. (Id. ¶ 55.)
In addition, Plaintiff alleges that Elsaca and Silva conspired to extract money from the Capri Star Trust in the form of sham legal fees paid to Silva's law firm. (Id. ¶ 57.) Between 2001 and 2009, for example, Elsaca authorized approximately $390,000 to be paid from the Capri Star Trust's account to Silva for legal services that were never actually rendered. (Id. ¶¶ 58-64.) Elsaca and his agents also allegedly authorized these transfers by wire or mail to UBS employees in New York. (Id. ¶ 57.)
C. Fintair Misappropriation
Plaintiff also alleges that Defendants secretly misappropriated at least $60 million from the Bascuñan Estate using a web of investment funds and off-shore shell companies, including the Anacapri Private Investment Fund ("Anacapri"). (Id. ¶¶ 68-70.) According to the SAC, Elsaca created Anacapri for Plaintiff's benefit in 2003, using funds from three separate Bascuñan Entities Elsaca controlled pursuant to the POA. (Id. ¶¶ 71-72.) The SAC, however, does not indicate where the funds belonging to these entities were held before they were transferred to fund Anacapri. Plaintiff alleges that Elsaca thereafter caused Anacapri to acquire Fintair, a BVI company Elsaca created for himself in 2000. (Id. ¶ 74.)
Although Fintair became part of the Bascuñan Estate as a result of the Anacapri acquisition, Elsaca opened a bank account in New York in Fintair's name (the "Fintair Account"), representing to the bank that he remained its sole owner. (Id. ¶¶ 75-77.) Plaintiff alleges that between September 2003 and July 2009, Elsaca, as well as Defendants Jara and Bretón,[4] made over a dozen wire and security transfers from the Bascuñan Estate into the Fintair Account, after which Elsaca transferred the funds to himself, entities he owned, and associates of his, including Jara and Bretón. (Id. ¶¶ 81-86; id. , Ex. B.) Again, however, the SAC does not indicate where the funds were held before they were transferred from the Bascuñan Estate to the Fintair Account. Plaintiff claims *309 that the Fintair Account fund transfers were not disclosed to him, and that the transferred funds were never returned to the Bascuñan Estate. (Id. ¶¶ 88-89.)
Plaintiff also alleges that between 2000 and 2009, Elsaca, Jara, and Bretón caused approximately $16 million to be transferred from Anacapri to bank accounts in New York maintained by GM & E (the "GM&E Accounts"). (Id. ¶¶ 123-25.) According to the SAC, Plaintiff has been unable to ascertain the location from which the funds used to pay the sham investment management fees were transferred. (Id. ¶ 126.) Plaintiff claims that these transfers, accounting for approximately 30% of the total funds contributed by the Bascuñan Entities to Anacapri, were sham investment management fees, which were never authorized by, nor disclosed to, Plaintiff. (Id. ¶¶ 120-21, 125.)
D. Tarascona Bearer Share Theft and Misappropriation
At the time he signed the POA in 1999, Plaintiff held 1.47% of his stake in BCI through Tarascona Corp. ("Tarascona"), a BVI entity. (Id. ¶¶ 8, 91.) Tarascona was in turn wholly owned by Hofstra Corp. ("Hofstra"), another BVI entity that was part of the Bascuñan Estate. (Id. ¶¶ 9, 91.) Hofstra's interest in Tarascona was represented by bearer shares stored in a J.P. Morgan safety deposit box in New York.[5] (Id. ¶ 91.)
Plaintiff alleges that between 1999 and 2004, Elsaca opened almost a dozen accounts at Morgan Stanley in Tarascona's name "for the purpose of misappropriating [the Bascuñan Estate's funds] and laundering them through the global banking system." (Id. ¶ 129.) As with other aspects of the alleged scheme, the SAC does not identify the location from which the assets used to fund the Tarascona accounts were taken. Plaintiff alleges that Elsaca misrepresented to Morgan Stanley in New York that he -not Plaintiff, nor Hofstra-owned Tarascona, so that he could freely transfer money from Tarascona to his own personal accounts. (Id. ¶¶ 130-32.) According to the SAC, between 2000 and 2003, Elsaca transferred more than $2.7 million from the Tarascona accounts in New York to bank accounts he opened in the name of Hay's Finance Corp, one of Elsaca's BVI shell companies. (Id. ¶¶ 17, 132, 135; id. , Ex. D.)
Plaintiff also alleges that on or about December 11, 2007, Elsaca or one of his agents traveled to New York and removed the Tarascona bearer shares from Hofstra's safety deposit box. (Id. ¶ 92,) Plaintiff further alleges that, three days later, Elsaca directed a Panamanian law firm to register the stolen Tarascona bearer shares in the name of Nueva T Corp. ("Nueva T"), a BVI entity Elsaca incorporated for himself on or about November 30, 2007. (Id. ¶¶ 94-98.) (Id. ¶ 101.) Plaintiff claims that approximately two weeks later, Elsaca sold Nueva T to Anacapri-and by extension, the Bascuñan Estate-for $43 million. (Id. ¶¶ 102-03.)
In addition, Plaintiff claims that between 2007 and 2010, Elsaca misappropriated proceeds of BCI stock dividends held in a Tarascona account in Chile and diverted them to bank accounts in New York, including the Fintair Account, before transferring them to himself and his associates. (Id. ¶¶ 136-39.)
E. Sham Anacapri Sale
Plaintiff claims that after misappropriating millions of dollars from Anacapri *310 through the Fintair Account, Elsaca and his associates ultimately misappropriated Anacapri itself through a sham sale to one of Elsaca's shell companies. (Id. ¶ 109.) More specifically, Plaintiff alleges that in July 2009, Elsaca and Jara authorized a capital reduction plan for Anacapri, which resulted in the Nueva T shares being reregistered in the names of the Bascuñan Entities that owned Anacapri. (Id. ¶¶ 110-11.) Without the Nueva T shares, Anacapri's book value decreased to approximately $21.5 million. (Id. ¶ 112.) Nevertheless, Elsaca caused the Bascuñan Entities to sell Anacapri at a steeply discounted price of about $7.5 million to Defendant Agrícola E Inmobiliaria Chauquén Limitada, a Chilean company owned by Elsaca. (Id. ¶¶ 22, 113.) Plaintiff alleges that the capital reduction plan and subsequent sham transaction were never disclosed to him. (Id. ¶ 119.)
II. LEGAL STANDARDS
A. Federal Rule of Civil Procedure 12(b)(6)
To survive a motion to dismiss brought under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly , 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal , 556 U.S. at 678, 129 S.Ct. 1937. In deciding a 12(b)(6) motion, the court must accept as true all well-pleaded allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC , 709 F.3d 109, 119-20 (2d Cir. 2013) ; Chambers v. Time Warner, Inc. , 282 F.3d 147, 152 (2d Cir. 2002). The court, however, need not credit "mere conclusory statements," Iqbal , 556 U.S. at 678, 129 S.Ct. 1937, nor must it give effect to "legal conclusions couched as factual allegations," Port Dock & Stone Corp. v. Oldcastle Ne., Inc. , 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly , 550 U.S. at 555, 127 S.Ct. 1955 ).
B. RICO
RICO confers a private right of action for treble damages to "[a]ny person injured in his business or property by reason of a violation" of the RICO statute. 18 U.S.C. § 1964(c) ; see also Bridge v. Phx. Bond & Indem. Co. , 553 U.S. 639, 647, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008). The RICO statute, in relevant part, makes it unlawful, "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."[6] 18 U.S.C. § 1962(c). Thus, to establish a civil RICO claim, "a plaintiff must show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." DeFalco v. Bernas , 244 F.3d 286, 306 (2d Cir. 2001) (internal quotation marks and citations omitted).
Because "the mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants,"-and since liability premised on *311 such claims carries with it the threat of treble damages and attorneys' fees-civil RICO has often been referred to as the "litigation equivalent of a thermonuclear device." Katzman v. Victoria's Secret Catalogue , 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (citations omitted); see, e.g., Palatkevich v. Choupak , 152 F.Supp.3d 201, 216 (S.D.N.Y. 2016) ; Turner v. N.Y. Rosbruch/Harnik, Inc. , 84 F.Supp.3d 161, 168 (E.D.N.Y. 2015). Accordingly, courts are encouraged to dismiss RICO allegations at an early stage of the litigation where it is otherwise appropriate to do so. Katzman , 167 F.R.D. at 655 (quoting Figueroa Ruiz v. Alegria , 896 F.2d 645, 650 (1st Cir. 1990) ). In addition, RICO claims premised on mail and wire fraud merit heightened scrutiny in light of "the routine use of mail and wire communications in business operations" and the attendant ease with which a plaintiff may attempt to fashion a RICO claim based on allegations that may turn out to be insufficient to plausibly support one. Crawford v. Franklin Credit Mgmt. Corp. , 758 F.3d 473, 489 (2d Cir. 2014) (citation omitted); see also Gross v. Waywell , 628 F.Supp.2d 475, 493 (S.D.N.Y. 2009) ("[T]he potential for transforming garden-variety common law actions into federal cases is greater if [the claims are] grounded entirely on [mail and wire fraud] predicates.").
1. Pattern of Racketeering Activity
To allege a "pattern of racketeering activity," RICO requires proof of two or more predicate acts that occurred within ten years of each other. 18 U.S.C. § 1961(5). "Racketeering activity," in turn, is defined to "encompass dozens of state and federal offenses, known in RICO parlance as predicates." RJR Nabisco , 136 S.Ct. at 2096. "These predicates include any act 'indictable' under specified federal statutes," such as those relating to mail, wire, and bank fraud, among others. Id. ; see also 18 U.S.C. § 1961(1).
To meet the "pattern of racketeering activity" element, a plaintiff must allege that the predicate acts have "continuity plus relationship which combines to produce a pattern." H.J. Inc. v. Nw. Bell Tel. Co. , 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (citation omitted). This so-called continuity requirement "can be satisfied either by showing a 'closed-ended' pattern-a series of related predicate acts extending over a substantial period of time-or by demonstrating an 'open-ended' pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." Spool v. World Child Intern. Adoption Agency , 520 F.3d 178, 183 (2d Cir. 2008) (citations omitted).
2. Extraterritoriality
In RJR Nabisco , the Supreme Court considered for the first time whether the RICO statute applies extraterritorially, i.e. "to events occurring and injuries suffered outside the United States." 136 S.Ct. at 2096. As the Court explained, the analysis involves two separate but related inquires: (1) "do RICO's substantive prohibitions, contained in § 1962, apply to conduct that occurs in foreign countries?", and (2) "does RICO's private right of action, contained in § 1964(c), apply to injuries that are suffered in foreign countries?" Id. at 2099. The Court answered both questions in the negative. See id. at 2100-11. In doing so, the Court recognized the "presumption against extraterritoriality," which holds that "absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." Id. at 2100 (citing *312 Morrison v. Nat'l Australia Bank Ltd. , 561 U.S. 247,255, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010) ).
As to the first issue, the Court held that "RICO applies to some foreign racketeering activity[,]" but only foreign conduct that "violates a predicate statute that is itself extraterritorial." Id. at 2103 (emphasis added). Accordingly, foreign conduct cannot form the basis of a RICO claim unless it "violate[s] 'a predicate statute that manifests an unmistakable congressional intent to apply extraterritorially.' " Id. at 2102 (quoting European Cmty. v. RJR Nabisco, Inc. , 764 F.3d 129, 136 (2d Cir. 2014), rev'd on other grounds , --- U.S. ----, 136 S.Ct. 2090, 195 L.Ed.2d 476 (2016) ). If, as here, the relevant predicate statute does not have extraterritorial application,[7] the plaintiff may still recover if "the case involves a domestic application of the statute," i.e. "[i]f the conduct relevant to the statute's focus occurred in the United States." RJR Nabisco , 136 S.Ct. at 2101. If, however, the conduct relevant to the statute's focus occurred abroad, "then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." Id.
With respect to the second issue, the Court similarly held that Section 1964(c), which confers a private right of action for RICO violations, does not apply extraterritorially. Id. at 2106. As the Court explained, "providing a private civil remedy for foreign conduct creates a potential for international friction beyond that presented by merely applying U.S. substantive law to that foreign conduct." Id. (citations omitted). Therefore, "[a] private RICO plaintiff ... must allege and prove a domestic injury to its business or property." Id.
III. THE SAC IS DISMISSED FOR FAILURE TO STATE A CLAIM
Defendants argue the SAC should be dismissed in its entirety for a number of reasons. First, they argue that Plaintiff's RICO claims should be dismissed because they fail to allege a domestic injury as required under RJR Nabisco and its progeny. (See Mem. at 19-21.) Next, Defendants assert that to the extent the SAC adequately alleges a domestic injury, Plaintiff's RICO claims should nonetheless be dismissed as involving improper extraterritorial applications of the relevant RICO predicate statutes. (Id. at 21-24.) Alternatively, Defendants argue that Plaintiff's RICO claims should be dismissed for failure to adequately allege a pattern of racketeering activity. (Id. at 24-26.) Finally, Defendants contend that this Court should decline to exercise supplemental jurisdiction over Plaintiff's remaining state law claims in the interests of "judicial economy, convenience, fairness, and comity." (Id. at 27.)
A. Use of Domestic Bank Accounts
Courts must separately consider each individual RICO injury alleged "[i]n order to determine where the economic losses alleged by a civil RICO plaintiff are located geographically." Bascuñan II , 874 F.3d at 817-18. The location of the alleged loss is important because "an injury to tangible property is generally a domestic injury only if the property was physically located in the United States" at the time "it was stolen or harmed."[8]
*313 Id. at 819, 821. For these purposes, money is considered tangible property if the funds were "situated in a specific geographic location at the time of the injury." Id. at 820. Accordingly, as the Second Circuit held in Bascuñan II , "the theft of specific assets from bank accounts located in [the United States]" is a domestic injury. Id. at 823. By contrast, "the use of bank accounts located within the United States to facilitate or conceal the theft of property located outside the United States" is not. Id. at 819.
Defendants correctly argue that Plaintiff's allegations concerning the use of domestic bank accounts to launder or conceal the theft of property from outside the United States does not allege a domestic injury. (Mem. at 19-21.) Indeed, little has been added to cure the deficiencies identified in Bascuñan II , where the court held that all but two aspects of Defendants' alleged scheme fell short of asserting a domestic injury. 874 F.3d at 818-24. As the court in Bascuñan II observed, the only domestic elements alleged in connection with most of Defendants' alleged conduct "pertain[ed] to Elsaca's laundering of stolen money using bank accounts in the United States and elsewhere." See id. at 818. However, as the Second Circuit explained, given the "the primacy of American banking and financial institutions, [and] particularly those in New York, .... [h]olding that a defendant's mere use of a domestic bank account could transform an otherwise foreign injury into a domestic one might well effectively eliminate the effect of the domestic injury requirement in a large number of cases." Id. at 819.
Plaintiff alleges that Defendants authorized millions of dollars to be transferred from the Bascuñan Estate to the Fintair Account in New York, which Elsaca and his associates then took for themselves. (SAC ¶¶ 75-77, 81-86.) Significantly, however, the SAC does not allege the funds misappropriated from the Bascuñan Estate "were physically located in the United States" at the time they "were stolen or harmed."[9] Bascuñan II , 874 F.3d at 819, 821. Rather, at most, the SAC alleges that banks located in New York were used to facilitate or conceal the theft of property taken from outside the United States. As the Second Circuit expressly held in Bascuñan II , such allegations are insufficient to constitute a domestic injury under RICO. See id. at 818-19.
The same is true with respect to Plaintiff's allegations that Defendants: (1) transferred funds from Anacapri to the GM & E Accounts in New York, (SAC ¶¶ 123-25),[10] (2) transferred funds from the Tarascona accounts in New York to bank accounts Elsaca opened in the name of one of his off-shore BVI shell companies, (id. ¶¶ 132, 135),[11] and (3) misappropriated proceeds *314 of BCI stock dividends from a bank account in Chile, (id. ¶¶ 136-39). In all these instances, the physical location from which Plaintiff's funds were allegedly misappropriated is either unknown or outside the United States. Therefore, the SAC fails to adequately allege a domestic injury with respect to these aspects of Defendants' scheme. See Bascuñan II , 874 F.3d at 812, 818-19 (rejecting claims where the complaint failed to identify the location from which foreign funds belonging to the Bascuñan Estate were misappropriated); see also Newman v. Jewish Agency for Israel , No. 16 Civ. 7593 (WHP), 2017 WL 6628616, at *4 (S.D.N.Y. Dec. 28, 2017) (dismissing RICO claims for failure to allege a domestic injury where the plaintiffs alleged money was taken from their bank accounts but "offer[ed] no specific allegations concerning where their accounts were located or used").
In addition, Plaintiff does not allege anything materially new or different about the alleged sham Anacapri sale, which the court in Bascuñan II considered and rejected as insufficiently tied to the United States to render it a domestic injury, See 874 F.3d at 812, 818-19 ; (compare First Am. Compl., ECF No. 18, ¶¶ 106-16, with SAC ¶¶ 109-19.)
Accordingly, Plaintiffs' claims based on these allegations are DISMISSED.
B. Afghan Trust Misappropriation
Defendants concede that the alleged misappropriation of funds from the Afghan Trust in New York for the purpose of generating sham fees satisfies RICO's domestic injury requirement. (See Mem. at 19-21.) However, Defendants argue that because this alleged conduct is not the "focus" of the wire, mail, and bank fraud statutes, Plaintiff's claims involve an improper extraterritorial application of RICO, (Id. at 22-24) (citing RJR Nabisco , 136 S.Ct. at 2101 ; Defs.' Reply, ECF No. 96, at 9-11.)
Where the relevant predicate statutes have no extraterritorially application, as here,[12] courts must consider "whether the [claims asserted] involve[ ] a domestic or extraterritorial application of the relevant law." Elsevier, Inc. v. Grossman , 199 F.Supp.3d 768, 781 (S.D.N.Y. 2016) (citing RJR Nabisco , 136 S.Ct. at 2101 ). That inquiry turns on the "focus" of the relevant RICO predicate statute. RJR Nabisco , 136 S.Ct. at 2101 ; accord In Matter of Warrant to Search a Certain E-Mail Account Controlled and Maintained by Microsoft Corp. , 829 F.3d 197, 210 (2d Cir. 2016), vacated on other grounds , --- U.S. ----, 138 S.Ct. 1186, 200 L.Ed.2d 610 (2018).
As several courts have recognized, the focus of the wire and mail fraud statutes is the "scheme to defraud."[13] United States v. Gasperini , 16 Cr. 441 (NGG), 2017 WL 2399693, at *7 (E.D.N.Y. June 1, 2017) (quoting United States v. All Assets Held at Bank Julius , 251 F.Supp.3d 82, 102 (D.D.C. 2017), and collecting cases); see also United States v. Greenberg , 835 F.3d 295, 305 (2d Cir. 2016) ("[T]he gravamen of the [mail and wire fraud] offense[s] is the scheme to defraud.") (internal quotation marks omitted). Accordingly, courts *315 have dismissed RICO claims predicated on violations of the wire and mail fraud statutes where the scheme to defraud was planned, managed, and directed from outside the United States. See, e.g., United States v. Prevezon Holdings LTD. , 122 F.Supp.3d 57, 71-72 (S.D.N.Y. 2015) ; Laydon v. Mizuho Bank, Ltd. , 12 Civ. 3419 (GBD), 2015 WL 1515487, at *8-9 (S.D.N.Y. Mar. 31, 2015) ; see also Petroleos Mexicanos v. SK Eng'g & Const. Co. Ltd. , 572 F. App'x 60, 61 (2d Cir. 2014) (dismissing RICO claim where the complaint failed to make "any allegations that the scheme was directed from (or to) the United States"). Indeed, "[w]hen foreign actors were the primary operators, victims, and structure of a RICO claim, courts in this Circuit have properly concluded that the claims were extraterritorial." Republic of Iraq v. ABB AG , 920 F.Supp.2d 517, 546 (S.D.N.Y. 2013) (citations omitted).
Here, the alleged fraud involved the misappropriation of funds from the Afghan Trust in New York to generate sham investment management and legal fees for services that Plaintiff claims were never actually rendered. However, the SAC does not allege that a scheme to defraud was developed, much less directed and managed from the United States. Cf. European Cmty. , 764 F.3d at 141-42 (alleged scheme was managed by employees in the United States, and involved laundering money through organized crime activities in New York). To be sure, Plaintiff does claim that Defendants authorized wire transfers of the sham fees from Plaintiff's bank account in New York to Defendants' accounts abroad. However, such conduct, by itself, is "merely incidental, preparatory, or peripheral to the principal fraud" of extracting sham fees from the Bascuñan Estate for services that were never performed. Norex Petroleum Ltd. v. Access Indus., Inc. , 540 F.Supp.2d 438, 444 (S.D.N.Y. 2007) (internal quotation marks and citation omitted) (rejecting RICO claim where defendants wired money through banks in the United States to bribe Russian officials), aff'd , 631 F.3d 29 (2d Cir. 2010) ; see also RJR Nabisco , 136 S.Ct. at 2101 ("[I]f the conduct relevant to the focus [of the predicate statute] occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory ") (emphases added).
Accordingly, Plaintiff's RICO claims premised on these allegations are DISMISSED.
C. Theft of Tarascona Bearer Shares
Stripped of the allegations that fail to support a domestic injury and involve an extraterritorial application of RICO, Plaintiff's RICO claims are predicated exclusively on the alleged theft and subsequent misappropriation of Tarascona bearer shares from Plaintiff's safety deposit box in New York. With respect to this sole remaining allegation, Defendants correctly argue the SAC fails to allege a pattern of racketeering activity, as required to state a claim under RICO. (Mem. at 24-26.)
As noted, to establish a pattern of racketeering activity, Plaintiff must show either closed-ended or open-ended continuity. Because the alleged misappropriation of funds ceased with Elsaca's and Bretón's respective terminations in 2009 and 2010, this case does not involve an open-ended pattern of racketeering activity.[14]
*316 To demonstrate closed-ended continuity, a plaintiff must allege "a series of related predicates extending over a substantial period of time." Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc. , 187 F.3d 229, 242 (2d Cir. 1999) (emphases added) (citation omitted). Closed-ended continuity is principally a temporal concept, and while not a bright-line rule, the Second Circuit has "never held a period of less than two years to constitute a substantial period of time." Spool , 520 F.3d at 184 (internal quotation marks and citation omitted). The mere fact, however, that predicate acts span two-years is insufficient to establish a pattern of racketeering activity. First Capital , 385 F.3d at 181. Other factors, "such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists." DeFalco , 244 F.3d at 321.
Plaintiff alleges that within a four-week period in late 2007, Elsaca (1) traveled to New York to steal the Tarascona bearer shares, (2) directed a Panamanian law firm to register the shares in the name of his own corporation, and (3) sold the shares back to the unsuspecting Bascuñan Estate at a profit, (See SAC ¶¶ 92-108.) These allegations do not meet RICO's pattern of racketeering activity requirement: the conduct alleged took place over the course of a single month, involved little variety, targeted a single victim, and amounted to a limited, targeted scheme to misappropriate Plaintiff's 1.47% stake in BCI and sell it back to the Bascuñan Estate. Accordingly, Plaintiff's allegations concerning the theft and misappropriation of the Tarascona bearer shares fall short of demonstrating a closed-ended pattern of racketeering activity. See First Capital , 385 F.3d at 181-82 (no closed-ended continuity where defendant engaged in a single scheme to defraud two creditors and then conceal the existence of those assets over a span of seven months); DeFalco , 244 F.3d at 322 (no closed-ended continuity where alleged predicate acts took place over one and a half years); Lynch v. Amoruso , 232 F.Supp.3d 460, 468 (S.D.N.Y. 2017) (no closed-ended continuity where alleged scheme lasted just over two years, involved "a limited number of participants[,] ... only one direct victim[,] ... and "only one scheme: an attempt to steal [the victim's] property").
Plaintiff's RICO claims based on the alleged theft and misappropriation of the Tarascona bearer shares are therefore DISMISSED.
D. Plaintiff's State Law Claims
Having dismissed the only claims over which it has original jurisdiction, this Court declines to exercise supplemental jurisdiction over the remaining state law claims. See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... [if] the district court has dismissed all claims over which it has original jurisdiction."); Purgess v. Sharrock , 33 F.3d 134, 138 (2d Cir. 1994) ("[T]he exercise of supplemental jurisdiction is left to the discretion of the district court."); see also Kolari v. N.Y.-Presbyterian Hosp. , 455 F.3d 118, 124 (2d Cir. 2006) ("We have repeatedly held that a district court particularly abuses its discretion when it retains jurisdiction over *317 state-law claims raising unsettled questions of law following dismissal of all original-jurisdiction claims."); First Capital , 385 F.3d at 183 (district court's declining to exercise supplemental jurisdiction was appropriate where the federal claims were dismissed "before significant discovery had taken place[,] ... many of the litigants [were] foreign nationals, and [the] case [was] likely to go on for years").
IV. CONCLUSION
Defendants' motion to dismiss the SAC in its entirety, (ECF No. 84), is GRANTED.
SO ORDERED.

For clarity and convenience purposes, this Court refers to Bascuñan as "Plaintiff," except where otherwise indicated.

Although this action was filed in the Southern District of New York, the individual parties in this case are all citizens and residents of Chile, while the entity parties are all foreign corporations, organized under the laws of either Chile or the British Virgin Islands ("BVI"). (SAC ¶¶ 7-24.)

A more complete factual background is set forth in this Court's opinion in Bascuñan I , as well as in the Second Circuit's decision in Bascuñan II , familiarity with which is assumed. The relevant factual background is restated only where necessary to address the pending motion to dismiss.

Jara was the general manager of GM & E Asset Management ("GM&E"), an entity owned by Elsaca that served as Anacapri's investment manager. (SAC ¶¶ 83, 122, 125.) Bretón served on Anacapri's Oversight Committee. (Id. ¶ 83.)

Bearer shares are equity securities wholly owned by the individual or entity holding the physical stock certificate. Investopedia, https://www.investopedia.com/terms/b/bearer_share.asp#ixzz5Nn2c0kYR (last visited Sept. 6, 2018).

The RICO statute also makes it unlawful to conspire to engage in such activity. See 18 U.S.C. § 1962(d).

The parties agree that the mail, wire, and bank fraud statutes do not apply extraterritorially. (See Mem. at 22); (Pls.' Mem. in Opp'n to Mot. to Dismiss ("Opp'n"), ECF No. 92, at 12.) The same is true with respect to the Travel Act. See European Cmty. , 764 F.3d at 141.

"Tangible property" refers to "property that can be fairly said to exist in a precise location." Bascuñan II , 874 F.3d at 820.

In fact, elsewhere in the SAC, Plaintiff suggests that the funds transferred to the Fintair Account came from Plaintiff's bank accounts in Chile. (See SAC ¶¶ 136-40.)

Plaintiff concedes he cannot allege these funds were misappropriated from bank accounts located in the United States. (See SAC ¶ 126 ("The situs of the [Bascuñan Estate] funds used to pay the Anacapri Fees is unknown to the plaintiffs at this time, despite extensive diligence in attempting to determine it,").)

Plaintiff argues the misappropriation of funds from the Tarascona accounts was a domestic injury because the funds were located in New York when they were stolen. (See Opp'n at 12 n.7.) However, the SAC alleges that the funds were misappropriated at an earlier point in time-and from an unidentified location-when Elsaca opened the Tarascona accounts for the specific purpose of stealing them from the Bascuñan Estate. (See SAC ¶ 129 ("[Elsaca] opened and maintained 11 accounts at Morgan Stanley in the name of ... Tarascona ... for the purpose of misappropriating [the Bascuñan Estate's] funds ... and laundering them through the global banking system.").) Accordingly, Plaintiff does not allege the funds were located in the United States "when [they were] stolen or harmed ." Bascuñan II , 874 F.3d at 821 (emphasis added).

See supra note 7.

The same is true with respect to the bank fraud statute. See Neder v. United States , 527 U.S. 1, 20-21, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) ("The bank fraud statute, which was modeled on the mail and wire fraud statutes, similarly prohibits any 'scheme or artifice to defraud a financial institution.' ") (quoting 18 U.S.C. § 1344 ).

Plaintiff argues the alleged conspiracy is open-ended because "laundering activity continues to this day." (Opp'n at 15.) Although Plaintiff alleges "upon information and belief" that Defendants made numerous transfers of money "to disguise and conceal the thefts," (SAC ¶ 198), the SAC does not identify any money laundering activity since March 2010. (See id. ¶¶ 196-205.) In any event, it is well settled that "continued silent concealment of assets is not a predicate act." First Capital Asset Mgmt., Inc. v. Satinwood, Inc. , 385 F.3d 159, 181 (2d Cir. 2004) (citation omitted).